BRIAN E. WILGUS, Indiv. and on Behalf of All Others Similarly Situated, Plaintiffs-Appellants, v. CYBERSOURCE CORPORATION, Defendant-Appellee.

Fifth District   No. 5—08—0057

Opinion filed August 27, 2009.

Howard Becker and John Libra, both of Korein Tillery, LLC, of St. Louis, Missouri, for appellants.

Alan K. Goldstein, of Goldstein & Price, L.C., of St. Louis, Missouri, for appellee.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Plaintiff Brian E. Wilgus, individually and on behalf of all others similarly situated, appeals from an order of the circuit court of Madison County granting a summary judgment in favor of defendant, CyberSource Corp., on plaintiffs' class action claim for breach of contract. The complaint was originally filed on July 19, 2002. After years of litigation and discovery, defendant moved for a summary judgment, which the trial court granted on January 21, 2008. In this appeal, plaintiffs contend the trial court erred in granting a summary judgment in favor of defendant because (1) there are genuine issues of material fact regarding whether defendant breached the contract, (2) the hearsay rule was improperly used to exclude competent evidence of a breach of contract, and/or (3) the parol evidence rule was improperly used to exclude competent evidence of a breach of contract. We reverse and remand.

## BACKGROUND

Plaintiffs are members of a certified class who were formerly employed by PaylinX Corp. (PaylinX), a St. Louis company, which merged with defendant. There are approximately 75 members of the class. Wilgus, the named plaintiff, joined PaylinX as a senior test engineer in March 2000. PaylinX no longer exists but was once a privately held company that designed computer software to process credit card transactions. Defendant is a publicly traded corporation on the NASDAQ. Defendant helps businesses process payment transactions over the Internet.

During their employment with PaylinX, plaintiffs were identified as "key" employees who were rewarded by PaylinX with stock options in order to entice them to remain employed with PaylinX. The "PaylinX Corporation 2000 Stock Option Plan" (Plan) specifically states that its purpose is to "provide incentive to directors, officers, key employees[,] and consultants of the Corporation by providing those persons with opportunities to purchase shares of the Company's Common Stock." In determining eligibility for the Plan, PaylinX took into account "the duties of the respective officers, key employees[,] and

consultants, their present and potential contributions to the success of the Company[,] and such other factors as the Board (or the Committee) shall deem relevant in connection with accomplishing the purposes of the Plan." The options under the Plan vested over time, thereby encouraging key employees to continue their employment with the company.

Once a stock option vested, the employee was required to pay to convert his or her options to common stock. The "strike price" was the price that the employee was required to pay to the company in order to convert a vested stock option to a common stock. The value of the option, therefore, was the difference between the strike price and the price of the common stock at the time the option was converted to common stock. The Plan contained a provision that would be triggered by a merger:

> "If while unexercised Options remain outstanding under the Plan (i) the Company executes a definitive agreement to merge or consolidate with or into another corporation or to sell or otherwise dispose of substantially all its assets \*\*\*, all Options shall be exercisable in full, whether or not otherwise exercisable."

The Plan required that an option be exercised "by giving written notice of such exercise to the Board." The "Board" was the board of directors of PaylinX. The Plan also required that "the Option Price shall be paid in full, at the time of exercise." Under the Plan, "[a]n optionee or a transferee of an Option shall have no rights as a shareholder with respect to any shares covered by his Option until the date of the issuance of a stock certificate to him for such shares."

The merger agreement between PaylinX and defendant was signed on July 9, 2000, but the merger was not actually completed until September 18, 2000. The merger agreement specified that defendant would assume the PaylinX employee stock options, which would then become options to buy defendant's stock. The parties agree that plaintiffs were presented with amended stock option agreements under which the vesting schedules changed; however, the parties disagree with regard to when these amendments were presented. Defendant contends that in June 2000, Wilgus agreed with PaylinX to a "First Amendment Stock Option." Plaintiffs assert that after the merger agreement was signed on July 9, 2000, plaintiffs were presented with the amended stock option agreements. In any event, under the old Plan, all unvested options would vest, while under the new plan, only one-half the options would vest. Plaintiffs were also given additional options.

For example, with regard to Wilgus, the "First Amendment Stock Option" states that his previous option to purchase 7,500 shares would

become an option to buy 9,000 shares. PaylinX options would be exchanged for defendant's options at a ratio of 1:1.2. The options for one-half of the 9,000 shares (4,500 shares) would accelerate or vest when the merger closed. The new vesting schedules also provided that the employees' stock options would vest in six months and every month thereafter.

According to plaintiffs, once the merger had taken place, they were required to rely on defendant to give them directions regarding how to exercise their stock options, because PaylinX ceased to exist. Plaintiffs could no longer give written notice to the board according to the original contract because the board also ceased to exist. Defendant instructed plaintiffs to exercise their options using an electronic trading method. This direction came via an e-mail written and sent by Phil Cooper, defendant's director of operations. The e-mail was sent on September 14, 2000, and explained that there was a blackout period, "a period of time during which the company has restricted its employees from trading the company's stock" in order to reduce the risk of violating federal securities regulations against insider trading. The e-mail stated as follows:

"Once I'm out of the blackout period, how do I exercise my options and trade the stock? A very convenient vehicle has been established to do this. Each employee will be able to do this on-line with Options Link—a service of E Trade. You can actually exercise your options and sell the stock without using any cash out of your pocket (assuming the stock is trading for a price higher than your option price). This is called a cashless exercise. We'll all learn more about the specific process used to exercise our options once we become employees of CyberSource."

The blackout period did not bar the exercise of employee stock options, only the trading of defendant's stock.

As previously stated, PaylinX and defendant merged on September 18, 2000. As of that date, Wilgus had a vested option to buy 4,500 shares of defendant's stock at $6.25 per share. Lisa Loder, the stock equity manager or administrator for defendant, was charged with the task of administering the E*Trade accounts. Plaintiffs were to receive and follow instructions contained in packets that were to be given to them by Loder. The packets were not made available to plaintiffs for months after the merger was finalized.

The packets were not available until after the blackout period was lifted. After a September 19, 2000, meeting between defendant's chief financial officer, Charles Noreen, and former PaylinX, now defendant's, employees, Noreen sent Lisa Loder an e-mail in which he informed Loder that the new employees were asking about the status of the op-

tion paperwork. Noreen asked, "What's the latest there?" On October 16, 2000, Loder finally replied to Noreen's e-mail, stating as follows:

"I will have all the option information in the system by the end of the week and will then begin processing the grants. I am going to send Judy Hawkins a file and ask her to fill in all the names and addresses for the PaylinX employees so that Evelyn and I can drop in the numbers. I am aiming to have all paperwork to them by early to mid[-]November but the options will be in the system as of Thursday evening."

Noreen responded: "We can't wait until mid[-]November to do this. We need to get some additional resources to help us here it sounds like to me." For whatever reason, the packets were not delivered to former PaylinX employees until after November 15, 2000, and plaintiffs could not access the E*Trade accounts until after that date.

As a part of the ongoing litigation, Lisa Loder explained in a sworn affidavit that Robert Stockton, a former PaylinX employee who did not continue employment with defendant, tendered a written stock option exercise agreement on September 25, 2000, along with a check for the exercise price. Other witnesses confirmed that there was a way to exercise options after the merger by giving written notice. Plaintiffs did not give written notice to exercise their options.

In the complaint, plaintiffs contend defendant breached the contract as follows:

"18. At the time of the merger, [defendant's] stock was selling at $10.75 per share.

19. [Defendant] prevented Plaintiffs from immediately exercising their right to purchase the optioned shares by failing to timely convert the PaylinX shares to Cyber[S]ource shares and by failing to timely establish E*Trade accounts, the sole means by which employees could exercise their right to purchase the shares.

20. Had Plaintiffs been able to exercise their options immediately after the merger as promised by [defendant], they would have been able to purchase the $10.75 stock for $6.25 per share.

21. By the time Cyber[S]ource finally converted the shares in November 2000, the price of Cyber[S]ource stock had dropped to $1.85 per share, making the options worthless."

Plaintiffs further contend that defendant also breached the contract by improperly imposing a trading blackout on plaintiffs, thereby preventing them from exercising their options and trading their shares on the open market.

The terms of the original stock option agreement do not mention a trading blackout period. There was no need to mention a trading blackout because PaylinX stock was not traded on the open market. In his deposition, Phil Cooper could not recall any written notification

about the existence of the blackout to PaylinX employees prior to September 19, 2000. By the time plaintiffs received the information about how to set up their E*Trade accounts and the blackout was lifted, the stock was virtually worthless to plaintiffs.

After years of discovery, defendant moved for a summary judgment on the basis that its sole obligation was to offer plaintiffs the opportunity to buy shares of stock at a fixed price, which plaintiffs chose not to accept and that, therefore, no reasonable jury could find that defendant breached the contract and caused injury to plaintiffs. Defendant argued that even assuming, *arguendo*, that plaintiffs had exercised their options, they could not have earned the alleged lost profits because the imposed blackout period prevented all the directors, officers, and employees from trading defendant's stock.

The trial court entered an order granting a summary judgment in favor of defendant. The trial court stated as follows:

"It has been this Court's experience that the cases in which the law appears to be clearly against the Court's own sense of fairness are always the most difficult to decide. This is such a case. The complaint is for 'Breach of Contract' only. The contract consists of the three documents that make[ ]up the Stock Option. The plaintiff's claims that he was lured into failing to exercise those options according to their own terms because of a belief that such manner of exercise would be futile, while evoking great sympathy by this court, appear to be immaterial to the issues in this case.

There is no Count nor [*sic*] claim for any equitable remedy, nor [*sic*] any apparent claim for the declaration of an equitable estoppel regarding the enforcement of the written and signed documents. All of the proposed evidence supplied by the plaintiff regarding alleged statements of the new manner for exercise of the options (e-trade accounts and the like) are [*sic*] hearsay statements which might be admissible [*sic*] as 'statements adverse to the defendant made by the defendant' if the plaintiff (and putative class representative) could attribute them to someone against whom the defendant could be held responsible. Furthermore, the plaintiff admits to not even having made and [*sic*] effort to exercise his stock options according to the contractual terms[,] when, had he or other members done so and been rejected[,] it certainly would have lended efficacy to his claim.

Finally, all of the evidence of these allegations by the plaintiff constitute [*sic*] 'parole' [*sic*] evidence which is outside the 'four corners of the contract documents' and could only be admissable [*sic*] pursuant to allegations of either ambiguity or fraud. What appears by the allegations of the plaintiff, even when all taken as true for purposes of this motion, is that the plaintiff discovered, after

the fact, that he could have exercised those stock options at a lower price and subsequently resold the stock at a nice profit ('hindsight is almost always 20/20'). There being nothing alleged by the plaintiff in the form of any written modifications of the options before, during[,] or after the merger[,] there appears to be no sufficient evidence for the plaintiff to proffer at trial that would be admissable [*sic*] for consideration by the court or the jury. As such, it is apparent that there exists no genuine issue of material fact for which any evidence can be produced."

Plaintiffs filed a timely notice of appeal.

## ANALYSIS

The issue we are asked to address is whether the trial court erred in granting a summary judgment in favor of defendant. Plaintiffs contend the trial court improperly excluded competent evidence of defendant's breach of contract through the misapplication of both the hearsay rule and the parol evidence rule. Plaintiffs insist that competent evidence in the record presents a genuine issue of material fact on the issue of a breach of contract. Defendant responds that the trial court properly granted a summary judgment in its favor because (1) it is undisputed that Wilgus never exercised his option to buy stock, (2) Wilgus never accepted the offer to buy stock, and (3) defendant had no further contractual obligations to him. Defendant also replies that the trial court properly disregarded inadmissible evidence pursuant to the hearsay rule and the parol evidence rule.

In Illinois, as a general rule, a summary judgment is encouraged as an aid to the expeditious disposition of a lawsuit. *Lavat v. Fruin Colnon Corp.*, 232 Ill. App. 3d 1013, 1023, 597 N.E.2d 888, 894 (1992). However, a movant may only be granted a summary judgment when all the pleadings, discovery materials, admissions, and permissible inferences, analyzed in the light most favorable to the nonmoving party, so clearly favor the movant that no fair-minded individual could dispute the movant's right to a judgment in his or her favor. *Wysocki v. Bedrosian*, 124 Ill. App. 3d 158, 164, 463 N.E.2d 1339, 1444 (1984). On appeal, a trial court's decision to grant a summary judgment will be affirmed only if, after examining the record, the reviewing court concludes that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law. *Fremont Indemnity Co. v. Special Earth Equipment Co.*, 131 Ill. App. 3d 108, 112, 474 N.E.2d 926, 930 (1985). In appeals from summary judgment rulings, review is *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992). Where a reasonable person could draw divergent inferences from undisputed facts, a summary judgment should be denied. *Pyne v. Witmer*, 129 Ill. 2d 351,

358, 543 N.E.2d 1304, 1308 (1989). We examine the parties' arguments on appeal with these principles in mind.

A review of the trial court's order shows that the trial court was conflicted about granting a summary judgment in favor of defendant because, in doing so, the trial court was acting contrary to its "own sense of fairness." After years of litigation and discovery, the trial court believed that defendant did not treat plaintiffs fairly after the merger, but it agreed with defendant that because this was a contract dispute, not an equitable matter, it was limited to the four corners of the documents. However, we agree with plaintiffs that there are multiple genuine issues of material fact which preclude the entry of a summary judgment and that the trial court misapplied both the hearsay rule and the parol evidence rule.

For example, there is a question of fact with regard to whether defendant breached the contract by failing to provide plaintiffs with the opportunity to exercise their stock options until on or after November 15, 2000. Defendant contends it gave plaintiffs the opportunity to exercise their options as early as September 25, 2000. In support of its argument, defendant points to Robert Stockton's written election, a copy of which was attached to Lisa Loder's affidavit. On September 25, 2000, defendant's shares were selling at a high of $13.06. If plaintiff and other members of the class had been able to exercise their options on that day, they would have realized a profit of $6.81 per share, when taking into consideration the strike price. However, a review of the record indicates that a reasonable person could conclude that written elections were not made available to plaintiff and other members of the class on that day.

Robert Stockton was a former PaylinX employee who did not continue his employment with defendant after the merger. Whether this was by choice or by termination, we do not know; however, the record does indicate that other former PaylinX employees were terminated after the merger. Plaintiffs in this case were "key" employees of PaylinX who were lured to stay on with defendant by virtue of their PaylinX stock options. The original Plan specifically states that upon a merger "all Options shall be exercisable in full." Defendant later amended the Plan, but it is clear that plaintiff and the class agreed to continue their employment as defendant's employees because of the stock options. There is no evidence in the record to indicate that the employees who continued to work for defendant were given written directions on how to exercise their options as early as September 25, 2000. To the contrary, there is substantial evidence that plaintiffs did not receive written directions until November 15, 2000.

On September 14, 2000, Phil Cooper, defendant's director of operations, sent an e-mail to Wilgus and others, in which he explained that in order for plaintiffs to exercise their options and trade stock, they would have to do so online through E*Trade. Lisa Loder was in charge of administering the E*Trade accounts for defendant. After a September 19, 2000, meeting between Charles Noreen, defendant's chief financial officer, and former PaylinX employees who were now employed by defendant, Noreen sent Loder an e-mail to inform her that several of the former PaylinX employees were asking about the status of the option paperwork, and he inquired into the status of the paperwork. Loder failed to respond to Noreen's e-mail for almost a month.

On October 16, 2000, Loder sent a reply in which she said she was "aiming to have all paperwork to them by early to mid[-]November." Noreen responded in no uncertain terms, "We can't wait until mid[-]November to do this." The record indicates that despite Noreen's protests, defendant did in fact wait until mid-November to establish the E*Trade accounts for the former PaylinX employees. By that time, the price of the stock had dropped so drastically that the shares were worthless.

Whether defendant made written elections to exercise options available to plaintiffs as early as September 25, 2000, or plaintiffs were not given the means to exercise their options until November 15, 2000, are clearly questions of fact better left for the trier of fact and are not questions that can be determined as a matter of law. Likewise, we are unconvinced that the blackout period justified the imposition of a summary judgment in favor of defendant. According to defendant, it imposed a trading blackout on plaintiffs in order to protect them from civil and criminal penalties associated with insider trading.

Insider trading is a crime because of the relation between the insider and the corporation. *Dirks v. Securities & Exchange Comm'n*, 463 U.S. 646, 653-54, 77 L. Ed. 2d 911, 921, 103 S. Ct. 3255, 3260-61 (1983). Insiders include corporate officers, directors, or controlling stockholders, all of whom have a fiduciary relation with the corporation. See *Chiarella v. United States*, 445 U.S. 222, 227-35, 63 L. Ed. 2d 348, 356-61, 100 S. Ct. 1108, 1114-18 (1980). "[A] corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him," and this duty arises when two elements are established: "(i) the existence of a relationship affording access to inside information intended to be available only for a corporate purpose, and (ii) the unfairness of allowing a corporate insider to take advantage of that information by trading without disclosure." *Chiarella*, 445 U.S. at 227, 63 L. Ed. 2d at

356, 100 S. Ct. at 1114. There is not a general duty to disclose before trading on material, nonpublic information, and a duty to disclose does not arise from the mere possession of nonpublic information but instead arises from the combination of the fiduciary duty and some kind of manipulation or deception. *Chiarella*, 445 U.S. at 235, 63 L. Ed. 2d at 361, 100 S. Ct. at 1118.

We agree with plaintiffs that as former PaylinX employees, they had no material inside information with regard to defendant's business. The mere fact that they became employees of defendant does not mean that they had access to any inside information not available to the public. Moreover, it is clear from Charles Noreen's e-mail to Loder that waiting until mid-November to set up the E*Trade accounts was too long. If defendant truly believed that plaintiffs would be unable to trade their options because of a violation of insider trading laws, would Charles Noreen have been adamant that the E*Trade accounts should be made accessible to plaintiffs sooner? The record is far from clear that plaintiffs would have been in violation of any securities laws by virtue of a stock trade.

We also point out that the terms of the stock option agreement do not include any mention of an imposition of a trading blackout period. There was no need for that because PaylinX was not a publicly traded corporation. The original Plan promised that "all Options shall be exercisable in full, whether or not otherwise exercisable." The subsequent amendments fail to discuss a blackout. Phil Cooper could not recall any written notification about the existence of a blackout to PaylinX employees before September 19, 2000. Defendant's stock was being actively traded, and it is fair to assume that many plaintiffs who were "key" employees only agreed to stay on with defendant after the merger because they believed they would reap the benefits of their stock options.

We agree with plaintiffs that the imposition of the blackout by defendant only serves to create further factual questions for the jury. There is a question regarding whether defendant breached the contract by improperly imposing a trading blackout on plaintiffs. Was the blackout imposed by defendant a legitimate business practice, or was it imposed to prevent plaintiffs from exercising their options and trading their shares on the open market, thereby devaluing defendant's stock further? Because such questions remain, we find that the trial court erred in granting a summary judgment in favor of defendant on the basis of the blackout.

In arguing against a summary judgment, plaintiffs relied on not only the depositions of Wilgus, Cooper, Noreen, and Loder but also the

e-mails from Cooper, Noreen, and Loder. The trial court found this evidence to be inadmissible hearsay and/or parol evidence, but we note that defendant relied on the same depositions and e-mails and Loder's affidavit in order to support its motion for a summary judgment. We believe that the depositions and e-mails were admissible. As plaintiffs point out, the terms and the validity of the contract are not in dispute and are contained within the four corners of the documents. What is in dispute is the performance of the contract and whether defendant breached the contract by failing to make the options exercisable in full on or before the merger. Such evidence cannot be found within the four corners of the documents, but within the conduct of the parties; thus, the e-mails, affidavits, and depositions are admissible.

In its order granting a summary judgment in favor of defendant, the trial court stated, "The contract consists of the three documents that make[ ]up the Stock Option." The trial court said that it only looked to the four corners of those documents; however, the trial court obviously looked to the affidavit of Lisa Loder and the attached documents regarding the options of Robert Stockton. The trial court also allowed evidence concerning the blackout period, which was not discussed anywhere within the four corners of the documents relied upon by the trial court. To allow some evidence and disregard other evidence on the basis of a hearsay violation or parol evidence violation constituted reversible error. We agree with plaintiffs that the trial court erred in excluding competent evidence of defendant's alleged breach of contract, by misapplying the hearsay rule and the parol evidence rule.

## CONCLUSION

After the careful consideration of the record before us, we find that the pleadings, discovery materials, admissions, and permissible inferences, analyzed in the light most favorable to plaintiffs, do not so clearly favor defendant that no fair-minded individual could dispute defendant's right to a judgment. The trial court erred in basing its decision only on the four corners of three documents and not the voluminous record that had been created during the six years of this protracted legal battle. We have reviewed the cases cited by defendant in support of its contention that the trial court did not err in granting a summary judgment, but we are unconvinced. The trial court's reluctance to impose a summary judgment was warranted, and we find that the trial court erred in granting a summary judgment in favor of defendant.

1050

For the foregoing reasons, we hereby reverse the order of the circuit court of Madison County and remand for further proceedings consistent with this opinion.

Reversed; cause remanded.

CHAPMAN and STEWART, JJ., concur.