MUNICIPAL SECURITIES, INC., MSI Governments, Inc., and MSI Holdings, Inc., Plaintiffs-Appellants,

v.

INSURANCE COMPANY OF NORTH AMERICA, Defendant and Third-Party Plaintiff-Appellee,

Tanya B. Hargraves, Third-Party Defendant.

No. 86–5024.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1986.

Decided Sept. 18, 1987.

Rehearing and Rehearing En Banc Denied Nov. 3, 1987.

8

Michael Richards (argued), Heiskell, Donelson, Bearman, Adams, Williams and Kirsch, Memphis, Tenn., Mary Aronov, for plaintiffs-appellants.

Thomas Johnston (argued), Randall Noel, Teresa Sigmon, William H. Thomas, Memphis, Tenn., for defendant and third-party plaintiff-appellee.

Before KRUPANSKY, NELSON and RYAN, Circuit Judges.

PER CURIAM.

The plaintiffs in this case sued Insurance Company of North America (INA) on an insurance policy, alleging that INA was guilty of bad faith in failing to honor its obligations under the policy. The district court entered summary judgment in favor of INA, and the plaintiffs appealed. Concluding that the policy provided no coverage for the plaintiffs' loss, we shall affirm the judgment of the district court.

I

Municipal Securities, Inc., is a broker-dealer specializing in government bonds. In January of 1981 the company hired Ms. Tanya Ann Hargraves as a trader. Stated simply, her job was to buy government securities from those who wished to sell them, and to locate buyers (either by herself or through salesmen) to whom the securities could be resold. Ms. Hargraves was responsible, among other things, for making sure that Municipal Securities did not find itself with too large an inventory on hand. In the fall of 1983, to put a specific limit on the company's exposure to loss from fluctuations in market prices, the company fixed $2,000,000 as the maximum amount of securities that Ms. Hargraves could hold in inventory without the written approval of her supervisor.

During the winter of 1984, Ms. Hargraves began making trades that took her far beyond the $2,000,000 inventory limit. She concealed this fact from her employer by failing to report certain purchases and by reporting sales that had not yet taken place. Her evident motive was to cover up—and eventually recoup—trading losses that might threaten her job security and affect her commissions. (She was entitled only to reduced commissions on trades that produced losses for the company, and her misconduct enabled her to pocket $14,674 in commissions to which she was not entitled because her trades had in fact resulted in losses.) By the time her misdeeds were discovered in March of 1984, Ms. Hargraves had run up a long position of $56 million; this was closed out at a loss of $956,931.39.

Municipal Securities had a fidelity bond issued by INA. Soon after discovery of its problem Municipal Securities notified INA of what had happened and asked for reimbursement. INA declined to pay, asserting that the loss was not covered under the policy. This lawsuit ensued. The district court entered summary judgment in favor of INA, and Municipal Securities appealed.

## II

"The court of appeals is mandated to apply the same test in passing upon an award of summary judgment as that utilized by the trial court to grant the motion. Accordingly, the conclusions of the trial court are not protected by the 'clearly erroneous' rule, but rather the appellate tribunal, viewing the evidence in the light most favorable to the party opposing judgment, must determine if a genuine issue of material fact exists." *Glenway Industries, Inc. v. Wheelabrator-Frye, Inc.*, 686 F.2d 415, 417 (6th Cir.1982) (citations omitted).

■ Under the insuring agreement of fidelity bond, INA was obligated to indemnify Municipal Securities against any losses coming within the following definition:

"(A) Loss resulting directly from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others, including loss of Property resulting from such acts of an Employee, which Property is held by the Insured for any purpose or in any capacity and whether so held gratuitously or not and whether or not the Insured is liable therefor.

"Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Employee, or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment."

INA argues first that Ms. Hargraves had no "manifest intent" to "cause the Insured to sustain" the loss of $956,931.39. We agree. Ms. Hargraves' manifest intent was to make money, not to cause her employer to lose money. She intended to violate her standing orders, to be sure, but not for the purpose of causing a huge loss. Ms. Hargrave's deposition testimony established without contradiction that her purpose was to eradicate the losses, not increase them.

■ Ms. Hargraves did intend her employer to lose $14,674 in commissions to which she was not entitled. INA has a second argument, however, which, if meritorious, compels a finding that there was no coverage with respect to the $14,674. To be covered under the policy, a loss must result directly from an employee's "dishonest or fraudulent" act. The definition of "dishonest or fraudulent" acts extends only to those dishonest or fraudulent acts committed with the "manifest intent ... to obtain financial benefit for the employee *... other than commissions ...* earned in the normal course of employment." (Emphasis supplied.) Since the only benefit Ms. Hargraves was seeking was her commissions, INA argues, there can be no coverage. The employer responds that because the commissions were obtained by fraud, they were not "earned in the normal course of employment." The district court did not find this rejoinder persuasive, under the case law, and neither do we.

In *Verex Assurance, Inc. v. Gate City Mortgage, Inc.*, C–83–0506W. (D.Utah, December 4, 1984), [Available on WESTLAW, DCT database], a federal district court considered a factual situation similar to ours that arose under contractual language identical to ours:

"There is no evidence that the three former employees of Gate City intended to cause Gate City any loss or obtained any financial benefit other than commissions from the allegedly fraudulent

scheme. There appears to be little dispute as to what the scheme was that the three former loan officers concocted. The loan officers allegedly decided to make loans to persons of questionable credit in order to collect the commission on those loans. In order to ensure that the loans were actually made, the loan officers allegedly falsified information on application forms.

"These elements of the scheme are the only elements revealed by the evidence, or even alleged in any of the pleadings. In order to constitute fraudulent acts within the meaning of the rider SR 6041, there must be a manifest intent by the employee to procure some sort of financial benefit other than salary, commissions, or similar benefits. There is no such evidence here. Instead, the evidence and allegations show that the loan officers engaged in the scheme in order to obtain commissions on the allegedly improper loans. That is simply not covered by the rider. *See Mortell v. Insurance Co. of North America*, 120 Ill. App.3d 1016, 76 Ill.Dec. 268, 275, 458 N.E.2d 922, 929 (1983) (no liability under a similar rider when only evidence was that 'salesmen did not gain anything except a commission from the unauthorized trading alleged in the customer complaints')."

We agree with this reading of the policy language. The language explicitly excluded dishonest or fraudulent acts intended to enhance the employee's regular compensation.

We AFFIRM the judgment of the district court.