Osier v. The City of Burlington, No. S1588-09 CnC (Crawford, J., Apr. 30, 2013)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

SUPERIOR COURT                                           CIVIL DIVISION
Chittenden Unit                                          Docket No.: S1588-09 CnC

FRED OSIER and EUGENE SHAVER
    Plaintiffs

       v.

THE CITY OF BURLINGTON and
JONATHAN LEOPOLD
    Defendants

DECISION ON PENDING MOTIONS RELATING TO MR. LEOPOLD'S LIABILITY

In their Fourth Amended Complaint, plaintiffs seek a money judgment against defendant Jonathan Leopold under three counts: (1) "Recovery of Taxpayer Funds Paid to BT in Violation of Law"; (2) fraud and deceit; and (3) breach of the duty of faithful performance. In a September 25, 2012 decision, the court concluded that 24 V.S.A. § 903 applied in this case to confer upon defendant Jonathan Leopold statutory nonliability for his role in Burlington Telecom's expenditures from the City of Burlington's pooled cash account in violation of Condition 60. Because the court concluded that § 903 applied, it also concluded that there was no need to determine which qualified-immunity standard to use for an expenditure falling outside of § 903. See Decision at 8 (filed Sept. 25, 2012).

Plaintiffs moved for reconsideration, and at a March 22, 2013 hearing on the City's budget process, it became clear that there is indeed a dispute of fact on an issue material to the application of § 903. Specifically, Mr. Leopold now acknowledges that, for fiscal years 2007 and 2008, there is a factual dispute about whether the City spent more on BT in those fiscal years than the amount appropriated in the applicable budget resolutions.

It is therefore necessary to return to the motions that relate to Mr. Leopold's liability and that were pending prior to the time that Mr. Leopold raised § 903. By way of review, those motions are: (1) Plaintiffs' motion for summary judgment against Mr. Leopold (filed Aug. 1, 2011); (2) Mr. Leopold's motion for summary judgment (filed Feb. 17, 2012); (3) Mr. Leopold's motion to dismiss Counts I and III (filed April 3, 2012); and (4) Mr. Leopold's (renewed) motion for summary judgment on Count II (also filed April 3, 2012).

BACKGROUND

The court recapitulates here the essential facts concerning the BT controversy, which are not in dispute. They have been the subject of several previous inquiries, including the order of the Public Service Board (PSB) which issued on October 8, 2010, available at http://psb.vermont.gov/sites/psb/files/orders/2010/7044OrderReSummaryJudgment.pdf.

The Burlington City Charter has long authorized the City to operate its own municipal electrical system. In 1996, the Vermont legislature amended the charter to permit City "ownership, operation and utilization of cable television, fiber optic cable and other telecommunications within the corporate limits of the city." 1995, No. M-17 (Adj. Sess.), § 23 (codified as amended at 24 V.S.A. app. ch. 3 § 431(4) (City of Burlington)). The charter change required such a City-owned utility to obtain a certificate of public good (CPG) from the Public Service Board.

The charter amendments also addressed the issue of funding for BT. Section 438(c) of the City Charter provides in part:

> If the city [elects to build a cable system], the public service board, in considering any application for a certificate of public good, shall ensure that any and all losses from these businesses, and, in the event these businesses are abandoned or curtailed, any and all costs associated with investment in cable television, fiber optic, and telecommunications network and telecommunications business-related facilities, are borne by the investors in such business, and in no event are borne by the city's taxpayers, the state of Vermont, or are recovered in rates from electric ratepayers.

24 V.S.A. app. ch. 3 § 438(c). From its conception, BT was required to pay its own way. The legislature prohibited the use of taxpayers' money to pay for capital or operating costs.

The Public Service Board issued a CPG in September 2005. The certificate includes Condition 60 which follows the charter amendment in forbidding the use of public money to pay for the cost of the BT "build-out" or construction. Condition 60 states:

> The City shall make payments on behalf of [the build-out of BT] only when and to the extent that BT has cash reserves, revenues receivable, or other payments receivable that, collectively, equal or exceed the sum of the payments to be made by the City plus the balance of any other current payments owed to the City. BT may participate in the City's pooled cash management system provided, however, that BT shall reimburse the City within two months of the City's expenditure for

2

any expenses incurred or payments made by the City in support of services that BT provides to non-City entities. The City shall obtain Board approval prior to appropriating any funds other than as described above in the support of BT's [build-out] activities.

Certificate of Public Good dated 9/13/05. Since 2007, BT has been unable to meet its construction costs and other expenses from operating revenues. Commencing in January 2007, it withdrew more money from the City's pooled cash account than it paid in. (The pooled cash account is the equivalent of a common checking account maintained for the use of all City departments.) By March 2007, it was in violation of Condition 60 because it had run a deficit in the account for more than 60 days.

According to defendants, BT was able to repay its initial overdraft in August 2007 when it obtained financing from CitiCapital. The relief was short-lived. By November 2007, BT was, again, drawing more money out of the pooled cash account than it put in. By January 2008, it was in violation of Condition 60 because the deficit had lasted more than 60 days. The deficit position continues to the present day and is currently approximately $16.9 million.

Jonathan Leopold was the Chief Administrative Officer of the City from April 2006 until July 1, 2011. As CAO, Mr. Leopold had direct supervisory authority over the finances of BT and the use of the pooled cash account. In his deposition, Mr. Leopold states that he was unaware of Condition 60 and the restriction on the use of the account until an attorney for the City informed him about the condition in November 2008. Mr. Leopold describes his decision to allow BT to run a large deficit in violation of the original charter amendments and the Certificate of Public Good as a pragmatic decision to borrow money in the short-term until refinancing was in place. He states that refinancing became unavailable in 2008 when the credit markets in the United States and elsewhere entered a state of crisis.

There is no evidence that any funds withdrawn from the pooled cash account were used for any purpose except the construction costs and other normal business expenses of BT. City money drawn from many departments—and from the taxpayers—was used to meet BT's expenses. There is no evidence—indeed, no allegation whatsoever—of corruption or personal benefit to Mr. Leopold or any other City employee. The plaintiffs allege only that the use of these City funds was unauthorized and occurred in obvious violation of the city charter and the requirements of the Public Service Board.

ANALYSIS

The court takes each count against Mr. Leopold in the Fourth Amended Complaint in turn, analyzing each of the various motions as they relate to each count.

## I.  Count I: "Recovery of Taxpayer Funds"

### A.  Plaintiffs' August 1, 2011 Motion for Summary Judgment

In their August 1, 2011 motion for summary judgment, plaintiffs assert that the only facts material to their motion are that Condition 60 exists, that Mr. Leopold was responsible for all expenditures from the City's "cash pool," and that Leopold authorized the expenditure of more than $16.9 million for BT from the "cash pool" in violation of Condition 60.  See Mot. at 14 (filed Aug. 1, 2011) ("Plaintiffs are entitled to summary judgment against Defendant Leopold based on the acknowledged and outstanding violations of BT's CPG."); see also Pls.' Reply at 2 (filed Oct. 11, 2011).  In short, plaintiffs advocate for a strict liability rule for public officials who spend money without legal authorization.

A strict liability approach has been followed in some jurisdictions.  See *Stanson v. Mott*, 551 P.2d 1, 15 n.12 (Cal. 1976) (collecting cases following the "strict liability" rule); 63C Am. Jur. 2d *Public Officers and Employees* § 339 ("Some courts . . . have followed a strict liability rule and hold a public official personally liable whenever he or she has permitted expenditures that the public entity is not authorized to make.").  The court concludes that the rule in Vermont cannot be the strict liability approach.  Rather, as one prominent authority explains:

> To justify the bringing of a taxpayer's action some improper motive of an officer is essential. The act complained of need not be corrupt in the sense of not being induced by a desire for pecuniary gain; but it must be done to accomplish some purpose foreign to the interest of the municipality which is tantamount to fraud. Bad judgment, even gross incompetency, is not bad faith.

18 E. McQuillin, The Law of Municipal Corporations § 52:8 (3d ed.) (WL updated Mar. 2013). As the *Stanson* court indicated, a strict-liability approach "imposes an overly harsh sanction on well-motivated public officials . . . ."  551 P.2d at 15.  The court will therefore deny plaintiffs' August 2011 summary judgment motion to the extent it bears on Count I of the Fourth Amended Complaint.[1]

---

[1] The August 2011 summary judgment motion was filed before the Fourth Amended Complaint, and thus did not technically speak to Count I of the Fourth Amended Complaint.  The arguments appear to be similar, however, and the court considers them here.

### B.  Mr. Leopold's February 17, 2012 Motion for Summary Judgment and his April 3, 2012 (Renewed) Motion for Summary Judgment

In his motions for summary judgment filed February 17, 2012 and April 3, 2012, Mr. Leopold argues that he is entitled to qualified official immunity from plaintiffs' claims.  The court begins with a short review of some of the procedural history pertinent to this issue.  Mr. Leopold raised the qualified immunity defense early in this case in the context of a motion to dismiss.  The court denied the motion, noting that the complaint alleged that Condition 60 was expressly violated by the payment of funds to BT with Mr. Leopold's knowledge and consent, and concluding that there was therefore a "facially persuasive claim that Leopold . . . violated a clear legal requirement of which any reasonable official in his position would have known."  Ruling on Def. Leopold's Mot. to Dismiss at 5 (filed Aug. 19, 2010) (Toor. J.).  The court subsequently denied Mr. Leopold's motion to take an interlocutory appeal on the question of qualified immunity.  See Ruling on Mot. for Interlocutory Appeal (filed Oct. 20, 2010) (Toor, J.).  The Supreme Court denied Mr. Leopold's motion to appeal the denial of his motions to dismiss and for permission to appeal, reasoning that his motion was untimely filed and "fails to demonstrate that the trial court abused its discretion by denying permission to appeal."  *Osier v. Burlington Telecom*, No. 2010-433 (Vt. Dec. 13, 2010) (unpublished mem.).

Plaintiffs have argued that the court's prior rulings on qualified immunity are now law of the case, and that under those rulings, Mr. Leopold is not entitled to qualified immunity.  Mr. Leopold maintains that the law-of-the-case doctrine should not apply to his motions for summary judgment because the prior rulings were made on a motion to dismiss—which employs a different standard than a motion for summary judgment—and because the court's prior rulings were in error and should be corrected.  The court concludes that its prior rulings on the question of qualified immunity did not finally resolve the issue because those rulings were made in the context of a motion to dismiss.  As Judge Toor recognized, the task before the court on the motion to dismiss was to evaluate the qualified immunity issue while taking the allegations of the plaintiffs' complaint as true; the court's denial of Mr. Leopold's motion to dismiss did not preclude him from coming forward with favorable information in the context of a summary judgment motion.  Ruling on Mot. for Interlocutory Appeal at 6.

The court turns now to the merits of Mr. Leopold's qualified immunity argument.  The qualified (or "good faith") immunity rule immunizes lower-level government officers, employees, and agents from tort liability where they are "1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority; 2) acting in good faith; and 3) performing discretionary, as opposed to ministerial acts." *Libercent v. Aldrich*, 149 Vt. 76, 81 (1987) (quotation omitted).  The court begins with the second element.

5

As Mr. Leopold points out, prior to the Supreme Court's decision in *Harlow v. Fitzgerald*, the qualified immunity defense had both an "objective" and a "subjective" aspect. 457 U.S. 800, 815 (1982). The objective element evaluates the reasonableness of an official's conduct as measured by reference to "clearly established law." *Id*. at 818. The subjective component refers to "permissible intentions." *Id*. at 815. In *Harlow*, the Supreme Court recognized that "substantial costs attend the litigation of the subjective good faith of government officials." *Id*. at 816. The Court therefore held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. at 818.

Mr. Leopold seizes upon the reference to "statutory or constitutional rights," and argues that he is entitled to qualified immunity on the theory that, where no claim is made that a constitutional or statutory right has been violated, only the *subjective* standard is applied; i.e., the inquiry is limited to whether the official acted out of malice, corruption, personal gain, or some other improper motive. In support, he cites, among others, a trio of cases from Alaska: *Crawford v. Kemp*, 139 P.3d 1249 (Alaska 2006), *Schug v. Moore*, 233 P.3d 1114 (Alaska 2010), and *Russell v. Virg-In*, 258 P.3d 795 (Alaska 2011). According to Mr. Leopold, this distinction is sensible because we expect public officials to know and follow constitutional and statutory provisions, but we do not expect them to possess "encyclopedic knowledge" of every federal, state, and local permit condition, agency regulation, or municipal code that might be implicated by their actions. Mr. Leopold's position is that there is no allegation of malice, corruption, personal gain, or similar improper motive, and thus the "good faith" element of qualified immunity is satisfied.

Whatever the law might be in Alaska or elsewhere, the law in Vermont is that the same objective test is used for state tort law claims as for any other claim. In a suit brought pursuant to 42 U.S.C. § 1983, the good faith inquiry asks whether an official's acts violated "statutory or constitutional rights" because § 1983 provides a remedy only for violations of federal constitutional and statutory law. *Murray v. White*, 155 Vt. 621, 630 n.4 (1991).[2] However, as the *Murray* Court explained:

> Qualified immunity from a state law claim does not contain the 'statutory or constitutional rights' limitation because a state law claim is not so limited. Qualified immunity from tort liability will not be made to depend upon whether the tort has been codified. Accordingly, the 'statutory or constitutional' limitation is not part of qualified immunity from state law claims.

---

[2] *Harlow* was not itself a § 1983 suit, but plaintiff in *Harlow* alleged that the defendants participated in a conspiracy to violate his constitutional and statutory rights. 457 U.S. at 802.

*Id.* Subsequent Vermont cases have reiterated that point. See *Sprague v. Nally*, 2005 VT 85, ¶ 4, 178 Vt. 222 ("Even in applying qualified official immunity to state tort law claims, we use the federal objective good faith standard . . . ." (quoting *Cook v. Nelson*, 167 Vt. 505, 509 (1998))); *Sabia v. Neville*, 165 Vt. 515, 521 (1996) ("Of course, when we consider state tort liability, the 'clearly established law' is not limited to federal constitutional and statutory rights, but may include Vermont statutes, regulations and common law.").

What role does the defense of qualified immunity play in this case? Mr. Leopold remains free to prove at trial that he had an objectively reasonable belief that his actions in overdrawing the pooled cash account were lawful. This defense is independent of the substantive elements of the claim against him. It is independent of any immunity conferred by section 903. Since "what he knew and when he knew it" is hotly disputed as a factual matter, it is unlikely that the defense can be successfully asserted through summary judgment. It depends upon fact-finding.[3]

The court therefore concludes that, even assuming that Mr. Leopold's actions in this case were discretionary and within the scope of his authority, he is not entitled to qualified immunity unless those acts meet the objective "good faith" standard. The absence of malice, corruption, personal gain, or similar improper motive is not sufficient to establish the "good faith" element of the qualified immunity defense. The analysis must focus on "the objective reasonableness of the official's conduct in relation to settled, clearly-established law." *Hoffer v. Ancel*, 2004 VT 38, ¶ 12, 176 Vt. 630 (mem.) (quotation omitted); *Cook*, 167 Vt. at 509. The court will therefore deny Mr. Leopold's February 17, 2012 motion for summary judgment.

### C. Mr. Leopold's April 3, 2012 Motion to Dismiss Count I

In addition to his summary-judgment motions, Mr. Leopold seeks dismissal of Count I pursuant to V.R.C.P. 12(b)(6). The motion is based largely on the following language in the Fourth Amended Complaint:

> Plaintiffs seek equitable relief requiring Defendants to restore the City's General Fund all sums advanced to BT from the cash pool in violation of BT's CPG or City Charter, plus interest. . . .

> Plaintiffs seek the following relief:

---

[3] In a filing dated April 8, 2013, Mr. Leopold argues that the qualified immunity issue must be resolved prior to trial because qualified immunity is not just a defense to liability, but is an immunity from suit. It is true that qualified immunity, if it applies, is an immunity from suit, but that does not mean that the issue must always be resolved prior to trial. See *O'Connor v. Donovan*, 2012 VT 27, ¶ 6 n.2, 191 Vt. 412 (noting that the elements of qualified immunity can, in some cases, "present fact questions that preclude dismissal or summary judgment"). However, if either party believes that the qualified immunity question can be resolved on summary judgment, the court will allow the parties an additional opportunity to make their arguments.

1.  Disgorgement, restitution, or other equitable relief resulting in the repayment with interest of all amounts improperly paid to BT from the General Fund.

Fourth Am. Compl. ¶ 37, Request for Relief ¶ 1. Mr. Leopold contends that, because he did not personally get anything of value as a result of the events recited in the complaint, there is nothing for him to disgorge, and neither was he unjustly enriched, so restitution is not a proper remedy. With respect to plaintiffs' request for "other equitable relief," Mr. Leopold contends that equitable relief is not available "because what [plaintiffs] ask for, the payment of money to the City's General Fund, is an adequate remedy at law." Mot. to Dismiss at 4 (filed Apr. 3, 2012). According to Mr. Leopold: "Even if the Plaintiffs were entitled under Count I to some kind of relief, that relief (and the relief for which they specifically ask) is money damages. This is clearly not an equitable remedy." *Id*. at 5. Plaintiffs have filed no opposition to Mr. Leopold's April 3, 2012 motion to dismiss.

The court agrees that disgorgement and restitution are not the proper remedies in this sort of case where there are no allegations of any personal benefit. The remainder of Mr. Leopold's argument seems to be that plaintiffs are asking for a legal remedy, and are therefore precluded from obtaining any equitable remedy. It is true that "[e]quity will not afford relief where there is a plain, adequate, and complete remedy at law. And if the complainant does have such remedy, and the main cause of action is of a legal nature, equity has no jurisdiction." *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶ 28, 187 Vt. 309 (quoting *Gerety v. Poitras*, 126 Vt. 153, 155 (1966)). The court fails to see how this principle would justify dismissal of the claim for equitable relief. If plaintiffs prevail on Count I and obtain complete relief against Mr. Leopold through a judgment for money damages, they would not care that no equitable relief might be available against him. What defendants are entitled to is better described as the *denial* of equitable relief on the merits, not the dismissal of the claim because it is inconsistent with the claim for money damages. The motion to dismiss Count I is denied.

## II.  Is there a Viable Claim of Fraud (Count II)?

Mr. Leopold sought to dispose of the fraud count on qualified immunity grounds in his February 17, 2012 motion for summary judgment and in his April 3, 2012 motion for summary judgment. For the reasons discussed above, the absence of malice, corruption, personal gain, or similar improper motive is not sufficient to establish the "good faith" element of the qualified immunity defense. However, Mr. Leopold's summary judgment motions raise an alternative argument: that the plaintiffs cannot prove the essential elements of fraud.

The elements of the tort of fraud require some transfer of value through a business transaction involving two parties.  In this case, Mr. Leopold acted at all times as an officer of the City. He authorized the expenditures from the pooled cash account in order to pay the expenses of BT. There was no "transaction" between himself and the City which could support a claim of

8

fraud. The plaintiff's fraud claim fails as a matter of law for the same reasons that claims of "conversion" or "theft" would fail. One cannot defraud oneself. For this reason, the court will grant Mr. Leopold's motion for summary judgment on the claim of "fraud and deceit."

The elements of a claim of fraud depend logically upon the engagement of two parties, one more knowing than the other, in a business transaction. These elements are:

1. an intentional misrepresentation of an existing fact;

2. affecting the essence of the transaction;

3. false when made and known to be false by the maker;

4. not open to the defrauded party's knowledge; and

5. relied on by the defrauded party to his damage.

*Union Bank v. Jones*, 138 Vt. 115, 121 (1980). The plaintiffs seek to meet these traditional criteria through allegations that Mr. Leopold failed to disclose his plan to borrow money from the pooled cash account to the City officials responsible for the supervision of BT. If he had only disclosed his plan, plaintiffs allege, those officials could have stepped in and prevented the misuse of the funds. Fourth Am. Compl. ¶¶ 40–46.

Plaintiffs' theory of fraud would transform any lie or omission by an employee to his supervisor into a fraud case. The cause of action is not so inclusive. If it were, it would completely dominate the fields of contract and employment law. The reason it does not apply to these facts is that the claim requires two parties: the "maker" of the false statement and "the defrauded party." These persons must be engaged in a "transaction," which the court interprets to mean that they must be counter-parties in some contractual relationship. One side must rely upon the other's false statement in entering into or performing the "transaction."

Here the City Council—the body that plaintiffs principally point to as the "defrauded party"—was not engaged in any transaction with Mr. Leopold. He was an employee who authorized expenditures for real debts actually owed by BT and the City. An employee can certainly defraud its employer, but that would require some misdirection of funds—essentially creating a two-party transaction. Or an employee could defraud an employer by providing a false resume or making other misrepresentations in the course of the "hiring transaction." But without some separation of the interests of the employer and the employee, there can be no "transaction" between them.

The taxpayers stand in no better position. They appear in this case only in a derivative or representative capacity. They have sued Mr. Leopold because the City has not. This does not make them into parties in a "transaction" with Mr. Leopold.

9

For these reasons, the court grants Mr. Leopold's motion for summary judgment with respect to the claim of fraud and deceit.

### III. Count III: "Breach of Duty of Faithful Performance"

The final count against Mr. Leopold is plaintiffs' claim that he violated his duty of "faithful performance" by authorizing taxpayer funds to be paid to BT in violation of Condition 60 and the city charter. This count follows the language of the bonding statute, 24 V.S.A. § 832. According to the allegations of the Fourth Amended Complaint:

> Leopold is liable to the Burlington taxpayers for repayment of the $16.9 million improperly paid to BT from the cash pool management system, and Plaintiffs may look to his surety. . . .

> Plaintiffs seek the following relief: . . .

> 2. A declaratory judgment that Defendant Leopold breached his duty of faithful performance and his fiduciary duty by authorizing expenditures from the City's cash pool to BT in violation of BT's Certificate of Public Good and/or the City Charter.

Fourth Am. Compl. ¶ 52, Request for Relief ¶ 2. The motions that pertain to Count III are: (1) plaintiffs' August 1, 2011 motion for summary judgment; and (2) Mr. Leopold's April 3, 2012 motion to dismiss.[4]

### A. Plaintiffs' August 1, 2011 Motion for Summary Judgment

Plaintiffs contend that they are entitled to summary judgment on Count III and to the declaratory judgment they seek because Mr. Leopold violated BT's CPG and the city charter. Mr. Leopold makes a number of arguments in his September 19, 2011 opposition that (1) plaintiffs' claim based on § 832 is a completely new theory raised for the first time in their summary judgment motion, and (2) section 832 does not apply to Mr. Leopold because it (or the equivalent bonding requirement in the Burlington city charter) does not create an independent duty or cause of action. Plaintiffs reply that their Third Amended Complaint (which was the operative pleading at the time) alleges sufficient facts to support declaratory relief, and that Mr.

---

[4] On February 17, 2012 Mr. Leopold also filed a motion seeking summary judgment on Count III of the Third Amended Complaint, which alleged breach of fiduciary duty against Mr. Leopold. Since Count III of the Fourth Amended Complaint is different, the court concludes that Mr. Leopold's February 17 motion for summary judgment on this point is largely moot. To the extent that the February 17 motion sought summary judgment on qualified immunity grounds, the argument for immunity is the same argument that the court rejected above. The absence of malice, corruption, personal gain, or similar improper motive is not sufficient to establish the "good faith" element of the qualified immunity defense.

10

Leopold's remaining issues—whether § 832 or the bonding requirement in the city charter create a private cause of action—are beside the point and not before the court. Plaintiffs say that they "simply ask this Court to declare that Defendant Leopold breached his duty of faithful performance." Pls.' Reply at 6 n.6 (filed Oct. 11, 2011).

The court will deny plaintiffs' motion because "the liability of a surety . . . on an official bond depends upon the liability of the principal . . . ." *Keefe v. Atkins*, 285 S.W.2d 338, 342 (Tenn. 1955). Here, it would be premature to declare the liability of any surety because Mr. Leopold's liability (if any) has not yet been established.

### B. Mr. Leopold's April 3, 2012 Motion to Dismiss

Mr. Leopold seeks to dismiss Count III pursuant to V.R.C.P. 12(b)(6). He asserts that Count III is an attempt to create a claim under a surety bond, and that any surety is a necessary party who is absent from this litigation, therefore necessitating dismissal. As noted above, plaintiffs have filed no opposition to Mr. Leopold's April 3, 2012 motion to dismiss.

"Where a judgment or decree against the principal is necessary to fix the liability of a surety, or where the latter expressly, or by reasonable implication, agrees to abide such judgment or decree, it is conclusive against him though not a party thereto, in the absence of fraud or collusion." *Probate Court v. Am. Fid. Co.*, 113 Vt. 418, 421 (1944). That statement alone makes it clear that a surety need not always be a party. The Restatement also contemplates litigation only between an obligee and a principal obligor. Restatement (Third) of Suretyship & Guaranty § 67 ("Preclusive Effect on Secondary Obligor of Litigation between Obligee and Principal Obligor"). Presently the briefing and the facts are insufficient for the court to conclude that this is a case where the surety must be a party. The court will deny Mr. Leopold's motion to dismiss.

### IV. Next Steps

As the discussion above makes clear, the extensive motion practice in this case has not done much to advance the litigation. The court concludes that the case would benefit from an inquiry into the specific elements of the plaintiff-taxpayers' cause of action. Neither side has squarely addressed the elements of the common law cause of action. The plaintiffs principally rely upon a theory that Mr. Leopold has breached his "duty of faithful performance." This label has an attractive rhetorical gleam, but it rests on an assumption that officers of corporations and municipalities are personally liable when they violate budget rules and regulatory requirements.

The remedy for misconduct by an employee or officer is not favorable to plaintiffs in cases in which there is no fraud, crime, or personal benefit to the employee. See 18 E. McQuillin, The Law of Municipal Corporations § 52:8 (3rd ed.) (WL updated Mar. 2013)

11

(liability requires showing of a purpose contrary to the interest of the municipality). Like other observers, the court has been critical of Mr. Leopold for engaging in unauthorized spending, but there is no allegation that the taxpayers' money was spent for any purpose than to build Burlington Telecom and to cover its operating losses.

Neither side has proposed the specific elements of a recognizable cause of action. And for good reason – it is very difficult to draft a prima facie claim against Mr. Leopold which fits within conventional legal norms. Starting at the back end of the problem, consider the issue of damages. Plaintiffs seek the repayment of $17 million from Mr. Leopold or his bonding company. But this money is not missing. It has all been spent on excavation, on the installation of cables and computers, on employee salaries and on all the other expenses of the city's enterprise. It would be circular to repay the city for money it has spent on its own property.

Perhaps the measure of damages is something different? There are allegations that Burlington Telecom's default on its financing has caused the city's bond rating to decline. Or Burlington Telecom may fail altogether as a result of the collection case brought by its principal creditor. These are grave problems, but we do not generally hold municipal and corporate officers liable for business losses of this nature. It is also unlikely that improperly injecting taxpayer funds into BT weakened BT's financial picture. The use of the $17 million in pooled cash surely had the opposite effect. It strengthened BT at the expense of taxpayers. It seems unlikely that plaintiffs are making a claim for consequential damages other than repayment of the $17 million.

It seems likely that any cause of action against a city official like the claim against Mr. Leopold must include an element of misappropriation for personal benefit. In other words, the official must take something before he can be ordered by judgment to return it. If the money has been spent within the city, then the city has benefited from the expenditure and cannot seek to recover it from its employee.

Consider the front end of the problem, which is the issue of bad faith as an element of the cause of action. The plaintiffs charge Mr. Leopold with something much like an intentional tort. They allege that he violated the CPG and failed to repay the pooled cash account within 60 days. It is not the law that any overdraft which goes unpaid because of falling revenues or some other shortfall results in the personal liability of the municipal officer who approved the borrowing. It would require some degree of bad faith before every department head who overspends the budgeted allocation in anticipation of revenues would have to pay the deficit in person.

"Bad faith" in the context of spending must mean something more than the violation of ordinances and regulatory conditions which require officials to comply with budget limits. Many municipal deficits occur in the face of ordinances which seek to prevent excessive spending. See

12

24 V.S.A. app. ch. 3 § 68 (City of Burlington) ("No money shall be paid out of the city treasury unless an appointed budgetary authorization for such expenditure exists, sufficient unexpended funds remain in such budgetary line item and a properly executed voucher requesting such expenditure is in the possession of the chief administrative officer's office for the proper spending authority."). Bad faith obviously includes spending and misappropriation of funds for the benefit of the official or to cause harm to the city. The court is inclined to limit the taxpayer's cause of action to those circumstances.

What then is the evidence of bad faith in this case? No one contends that Mr. Leopold violated the CPG and overdrew the pooled cash account in order to impose the costs of Burlington Telecom on the taxpayer. That has been the result of his decisions, but even plaintiffs do not suggest that this was his intent. There appears to be agreement between the sides that Mr. Leopold's plan was to run an overdraft only for as long as it took to secure new financing as he had done before. If this is undisputed – and the court will give plaintiffs their turn to comment – then it is hard to see how plaintiffs can prove bad faith.

In some ways, this case is similar to *Municipal Securities, Inc. v. Insurance Co. of North America*. There, a bond trader exceeded by $54,000,000 the inventory limit placed upon her by her employer, and attempted to conceal the violation by submitting deceptive reports. 829 F.2d 7, 8 (6th Cir. 1987) (per curiam). The employee's misdeeds caused her employer a loss of nearly $1 million. *Id*. The employer sought to recover against the company that had issued a fidelity bond for the bond trader. *Id*. at 9. The fidelity bond obligated the insurer to indemnify the employer against losses resulting from the employee's "dishonest or fraudulent acts," which was defined in pertinent part as acts committed with the "manifest intent" to "cause the Insured to sustain such loss." *Id*. The Court of Appeals held that the employee's "manifest intent was to make money, not to cause her employer to lose money. She intended to violate her standing orders, to be sure, but not for the purpose of causing a huge loss." *Id*. The court affirmed the entry of summary judgment in favor of the insurer.

This case is similar. It is undeniable that at some point in the development of BT, Mr. Leopold understood that he could not spend City money on a City project in violation of Condition 60. However, there is no evidence that his purpose in violating Condition 60 was to cause a loss to taxpayers.

The court proposes that the elements of the taxpayers' cause of action can be defined as follows:

1. The official authorized the expenditure of city funds in violation of law, including regulatory conditions;

13

2.  The official acted in bad faith, which is defined as intending to benefit himself or others financially or to cause harm to the city; and

3.  Funds or property of the city were paid to the official or other persons and not repaid to the city.

The court's proposed cause of action is a form of equitable restitution.  See Restatement (Third) of Restitution and Unjust Enrichment, § 43 ("A person who obtains a benefit (a) in breach of a fiduciary duty, (b) in breach of an equivalent duty imposed by a relation of trust and confidence, or (c) in consequence of another's breach of such a duty, is liable in restitution to the person to whom the duty is owed.")  It defines the plaintiff's remedy in a way that is predictable and familiar.  It does not create a new cause of action, previously unrecognized in Vermont.  It solves the problem of "double recovery" presented by the plaintiffs' proposal that Mr. Leopold simply repay the money currently invested in Burlington Telecom.  It does not impose liability upon officials who violate state law by overspending but direct this spending to legitimate municipal purposes.

The court understands that this section of the decision is necessarily incomplete because the court has not heard from the parties on these issues directly.  Either side is permitted 30 days to file a last motion for summary judgment which addresses these concerns.

CONCLUSION

Plaintiffs' motion for summary judgment against Mr. Leopold (filed Aug. 1, 2011) is denied.

Mr. Leopold's motion for summary judgment (filed Feb. 17, 2012) and renewed motion for summary judgment (filed April 3, 2012) are granted in part and denied in part.  Insofar as those motions concern the defense of qualified immunity, the motions are denied.  The motions are granted with respect to Count II.  Insofar as the February 17, 2012 motion seeks summary judgment on Count III of the Third Amended Complaint, the motion is moot.

Mr. Leopold's motion to dismiss (filed April 3, 2012) is denied.  Either party may, within 30 days, file a new motion for summary judgment.

Dated at Burlington this ___ day of April 2013.

_____
Geoffrey Crawford,
Superior Court Judge

14