HARTFORD ACCIDENT AND
INDEMNITY INSURANCE
COMPANY, Plaintiff,

v.

WASHINGTON NATIONAL
INSURANCE COMPANY,
Defendant.

No. 85 C 06462.

United States District Court,
N.D. Illinois, E.D.

May 6, 1986.

John W. Dondanville, Thomas A. Doyle, Baker & McKenzie, Chicago, Ill., for plaintiff.

Roderick A. Palmore, James T. Nyeste, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

### GETZENDANNER, District Judge:

This diversity action, before the court on cross-motions for summary judgment, requires this court to interpret a critical clause of an insurance contract. Defendant Washington National Insurance Company ("WNIC") is the holder of a fidelity bond, issued by plaintiff Hartford Accident and Indemnity Company ("Hartford"). The bond indemnifies WNIC for losses arising from the fraudulent and dishonest acts of its employees and agents, as those acts are defined in the contract of indemnity. Beginning in 1982, two WNIC agents, Kevin Masteller and Errol Phillips, engaged in schemes whereby they were able to acquire monies to which they were not entitled from WNIC. These schemes caused WNIC substantial economic loss. Those losses prompted WNIC to file "proof of loss" documents with Hartford and demand indemnification. Hartford now seeks a declaration, under 28 U.S.C. § 2201, that it is not required under the terms of the fidelity bond to cover the type of loss that occurred here. For the reasons herein, the court substantially agrees but nevertheless must deny both motions for summary judgment.

### Background of the Case

WNIC is in the business of selling life insurance policies. To maximize the incentive for agents to sell policies, WNIC paid its salespeople a disproportionate percentage of the expected receipt of a life insurance policy's premiums during the first few years that the policy was in effect. Although all premium payments for the policy would not be fully made for several years, and might be discontinued entirely if the policy were cancelled, a very large commission was paid in the first year to reward the salesperson. According to Hartford, the commissions received by the agent in the first year frequently equaled or exceeded 100% of the total premiums actually paid by the buying policyholder in that first year.

Apparently driven by the inducement of receiving such high commissions in the early years of the policies, Masteller and Phillips concocted schemes whereby insurance policies would be sold to private individuals, but Masteller or Phillips would themselves finance or assist in the financing of the premium payments. Since Masteller and Phillips would receive more from WNIC in commission payments than they would have to pay in premiums during the first year, it became profitable for them to personally pay the premiums or assist in financing the premium payments in the first year of the policy. Although there are certain similarities between their schemes, there is no claim that Masteller and Phillips worked together to defraud WNIC.

Masteller's scheme involved the creation of two charitable donation programs ostensibly for the purpose of enabling charitable donors to contribute toward life insurance policies written on the lives of key executives of Gonzaga University and Seattle University. The charitable donors were employees of the Burlington Northern Railroad. Burlington Northern employees were eligible for matching charitable donations from the Burlington Northern Foundation, which provided $2.00 in donations for every $1.00 of charitable gift given by a Burlington Northern employee. Masteller's plan had him purchase a cashier's check with his own funds in the name of the Burlington Northern employee who would then execute the Burlington Northern Foundation matching gift form as if said employee were making a contribution to a university. Masteller would then send the cashier's check and the matching gift form to the university, the proceeds of which would then be used to buy life insurance policies on key university personnel. The policies then generated commissions for Masteller to which, the parties agree, he was not entitled. Burlington Northern employees were told they would receive tax deductions as a result of the scheme.

The Phillips scheme is similar to Masteller's in all material respects, though the details are substantially more complex.

Accordingly, his scheme will only be outlined here. Phillips, like Masteller, created a charitable gift program for colleges and universities in Utah. Phillips represented that anonymous donors were encouraged to donate monies to pay premiums on policies owned by universities. In reality, there were no donors contributing significant amounts to the Phillips program. The premiums were funded, essentially, by use of the commission payments made by Phillips or one of his associates. Initially, the premiums were paid with funds supplied by associate Kenlon Reeve, in the form of a loan to Phillips which he repaid. Some of the premium payments were financed by taking loans against the built up cash values of the policies, or by taking loans out from established lending institutions. The purpose and net result of the plan was to induce WNIC "to pay commissions which Phillips had not earned to which he was not entitled." WNIC Ans. ¶ 32.

In sum, the Masteller scheme cost WNIC $360,465.93 in the form of commissions and subsidies. The Phillips scheme caused WNIC (and its affiliated business) to incur losses of $8,525,426.35 in commissions and other compensation payments, $2,970,- 601.78 in policy loans, $400,000 in death claims, and $1,900,000 in settlement of claims by North American Life and Casualty Company. WNIC also has incurred related losses of $38,698.50, as a result of settlements entered into with the educational institutions and employers.

### Legal Issue Presented

WNIC has put in two claims for much of the above-recited losses on the grounds that those losses are the direct result of Masteller's and Phillips' fraudulent acts. In a letter dated July 15, 1985, Hartford denied both of these claims. Hartford's denial is based on its argument that the losses are not within the scope of the coverage provided by the fidelity bond because the two schemes do not meet the definition of "dishonest and fraudulent acts" as set forth in the rider to the fidelity bond contract.

In order for a loss to be covered by the fidelity bond, it must be the "direct result" of a "dishonest or fraudulent act." Such acts are explicitly defined in the rider to the Hartford indemnity agreement:

Dishonest or fraudulent acts as used in this insuring Clause shall mean only dishonest or fraudulent acts committed by such Employee or Agent with the manifest intent:

(a) to cause the insured to sustain such loss; and

(b) to obtain financial benefit for the Employee or the Agent, or for any other person or organization intended by the Employee or the Agent to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment.

The dispute in this case is whether part (b) of this definition has been satisfied. For purposes of the pending cross-motions, it may be assumed that Masteller's and Phillips' acts were committed with the intent to injure WNIC, thus satisfying part (a). The question presented is whether Masteller and Phillips also intended that they (or perhaps others) should receive some financial benefit from their actions other than salaries, commissions, or some other employee benefit earned in the normal course of employment. If they did not so intend, i.e., if they intended only to receive "commissions," then part (b) of the definition would not be met and Hartford would not be required to indemnify WNIC for any of the losses directly resulting from Masteller's and Phillips' actions.

The parties agree that the purpose and intention of the two schemes was to obtain commissions which "were not earned and received in the normal course of employment." WNIC Ans. ¶ 17 and Hartford's Statement of Undisputed Facts ¶ 6. The question, then can be put more precisely: Is part (b) of the dishonesty definition satisfied when Masteller's and Phillips' intent was to financially benefit themselves with commissions that were not earned in the

normal course of employment? Because the bond excludes coverage for losses from an employee's intent to financially benefit himself with "commissions," the question can be put another way. Does the Hartford bond, which excludes coverage for losses from an employee's intent to receive "commissions" also exclude coverage for losses from an employee's intent to receive "commissions not earned in the normal course of employment?"

### Legal Discussion

The resolution of the cross-motions for summary judgment here depends entirely on the interpretation of the fidelity bond contract. As just stated, the parties agree that Masteller's and Phillips' intent was to receive commissions not earned in the normal course of employment. As this is an Illinois diversity action, this federal court must decide whether under Illinois law an intent to receive commissions not earned in the normal course of employment is excluded from indemnity coverage under part (b) of the dishonest and fraudulent act definition. This court's obligation is to follow the Illinois Supreme Court on this question, or if that court has not yet spoken, as it has not, predict what that court would do if presented with the issue. *White v. United States*, 680 F.2d 1156, 1161 (7th Cir.1982); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3rd Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Furthermore, federal courts should not disregard uniform state appellate court results absent persuasive data that the highest court would decide otherwise. *West v. American Telephone and Telegraph Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940).

The court is also mindful of the well settled rules of construction of insurance contracts. The insurer has the burden of proving the applicability of a provision which purports to exclude coverage. *U.S. Fidelity & Guaranty Co. v. Brennan*, 88 Ill.App.3d 467, 43 Ill.Dec. 613, 410 N.E.2d 613 (4th Dist.1980); *Marsh v. Metropolitan Life Insurance Co.*, 70 Ill.App.3d 790 (2d Dist.1979). All ambiguities are to be resolved in favor of coverage and exclusions from coverage must be construed narrowly. *Grahame v. Mitchell*, 28 Ill.App.3d 334, 342, 329 N.E.2d 17 (5th Dist.1975); *Lumbermen's Mutual Casualty Co. v. Norris*, 15 Ill.App.3d 95, 303 N.E.2d 505 (5th Dist.1973). The rule that insurance contracts should be construed liberally in favor of the insured and strictly against the insurer, however, applies only when the language is ambiguous. *Cobbins v. General Accident Fire & Life*, 53 Ill.2d 285, 290 N.E.2d 873 (1972); *Henderson v. Newland*, 41 Ill.App.2d 263, 190 N.E.2d 861 (2nd Dist. 1963), *rev'd on other grounds*, 30 Ill.2d 462, 197 N.E.2d 21 (1964). Where there is no ambiguity in the terms of an insurance contract, neither party should be favored in its construction. *Winkler v. State Farm Mutual Auto Insurance Co.*, 35 Ill.App.3d 493, 341 N.E.2d 379 (4th Dist.1976); *Continental National American Group v. Vaicunas*, 26 Ill.App.3d 835, 325 N.E.2d 747 (1st Dist.1975).

With these principles in mind, the court must interpret this definition of dishonest and fraudulent acts. Initially the court notes that this definition, perhaps ironically, was adopted by the fidelity insurance industry in 1976 in an effort to eliminate prior confusion over the definition of "dishonest and fraudulent acts." Since the adoption of this new industry-wide definition, few courts have been confronted with the task of interpreting this crucial clause. Several have dealt with the same dishonesty clause presented here, but in somewhat different contexts. *See, e.g., Towne Management v. Hartford Accident and Indemnity Co.*, 627 F.Supp. 170 (D.Md. 1985); *Shearson/American Express v. First Continental Bank*, 579 F.Supp. 1305 (W.D.Mo.1984). Such authorities, accordingly, are of little help here. Fortunately, one of the few courts to directly address the contract interpretation question presented here is from Illinois.

*Mortell v. Insurance Co. of North America*, 120 Ill.App.3d 1016, 76 Ill.Dec. 268, 458 N.E.2d 922 (1st Dist.1983), *reh. denied*, Jan. 23, 1984, *leave to appeal de-*

*nied*, June 5, 1984, involved an action by a futures commodities merchant (Rosenthal) on two fidelity bonds issued by the insurer (INA). In *Mortell*, Rosenthal argued that certain losses it sustained (i.e., claims from defrauded customers against Rosenthal), which were caused by the fraudulent and dishonest acts of Rosenthal agents, were covered by the bonds. The same industry-wide definition of fraudulent and dishonest acts involved here was at issue there. The court, in deciding that Rosenthal's losses were *not* covered by the fidelity bonds, observed:

> In support of its motion for summary judgment, INA presented the deposition of Rosenthal's compliance officer who had investigated the customer claims. The compliance officer stated that the salesmen did not gain anything except a commission from the unauthorized trading alleged in the customer complaints ... Rosenthal has not cited any authority for its position that the amendment [the new definition for fraudulent and dishonest acts] should not be given effect ... Rosenthal has not argued that it did not understand the plain meaning of the amendment at the time the amendment was executed. The terms of the agreement are unambiguous and must be given effect as written. (*Sowinski v. Ramey* (1976), 36 Ill.App.3d 690, 695, 344 N.E.2d 635).

458 N.E.2d at 929. Thus, the court decided that commissions "from unauthorized trading" (that is, commissions not earned in the normal course of employment), were excluded from fidelity bond coverage. This implies that any sort of commissions received by the employee are excluded from bond coverage, not just commissions earned in the normal course of employment.

If this is the meaning of *Mortell*, and it appears to be so, this court would be obligated to follow its holding, absent persuasive data that the Illinois Supreme Court would not follow the holding. Because the holding declares the definition provision to be unambiguous and excludes indemnity coverage for losses resulting from unearned commissions as well as earned commissions, that holding would appear to defeat recovery here. However, because the holding is not stated as carefully as it might be, the court examines the other available authority in this area.

In *Benchmark Crafters, Inc. v. Northwestern National Insurance Co.*, 363 N.W.2d 89 (Minn.App.1985), a toy salesman caused his employer a substantial loss by submitting false orders from different accounts for the employer's new line of infant toys. It was uncontroverted that the salesman "did not gain anything except his regular salary and expenses from the fraudulent acts." 363 N.W.2d at 91. In the employer's action to collect on a fidelity bond using the same definition of fraudulent and dishonest acts as involved here, the court, citing to *Mortell's* holding that the definition is unambiguous, held that the second element of the fraud definition had not been met. Even though the salesman intended that his financial benefit come from fraudulently acquired and therefore unearned salary, it was salary nonetheless and was therefore excluded from coverage. Thus, *Benchmark* follows *Mortell* to read part (b) of the definition to exclude recovery for all acts where the intent was "to obtain financial benefits ... other than salaries [or] commissions" regardless of whether those salaries or commissions were "earned" in the normal course of employment.

Perhaps the best explanation of this result is found in an opinion that happens to be unreported. *Berger v. Fireman's American Loss Control Co.*, slip op. Court of Appeals, M.D. No. 508 (Dec. 16, 1982) presents virtually a precise replication of the position WNIC advances here. Berger was in the business of leasing automobiles. One of his salesmen, Thomas Miller, fraudulently led Berger to believe that he had obtained for the company lease agreements for over 150 cars. For these agreements, Miller was paid commissions. The insurance policy contained the same definition of dishonesty as is found in WNIC's fidelity bond. In explaining why it was rejecting

Berger's claim that the insurance policy covered the losses he sustained as a result of the fraud, the court wrote:

> In the instant case, Berger would have us read the language of subsection (b) as follows: "to obtain financial benefit for the Employee, ... other than salaries, [or] commissions ... earned in the normal course of employment." Appellant asseverates that the phrase "earned in the normal course of employment" indicates an intent to limit the scope of the exclusion. Since the financial benefits which Miller obtained were not *earned* at all, they obviously could not be earned in the normal course of employment. Therefore, they are not excluded from coverage.
>
> We have an entirely different view. There is no need for construction.
>
> We observe that the phrase "other employee benefits" precedes the phrase "earned in the normal course of employment." As there is no comma between these two phrases, it is clear that they are to be read together as one phrase. Such a reading makes substantive sense in that prior to this phrase, the exclusionary clause names specific examples of the general category of employee benefits earned in the normal course of employment. A proper reading of the pertinent language is: "to obtain financial benefit for the Employee, ... other than salaries, [or] commissions...."
>
> *The* Comprehensive Crime *Insurance Policy clearly and unambiguously excludes from coverage the acts of an employee who fraudulently or dishonestly obtains salary or commissions.* (emphasis added).

Slip op. at 3–4.

█ Thus, viewed solely from the perspective of Illinois precedent, and the available authority elsewhere, all types of commissions and salaries are excluded from indemnity coverage, even commissions and salaries which have not been earned in the normal course of employment. More precisely, all courts to speak on the matter have found the industry-wide definition of "dishonest and fraudulent acts" to be unambiguous; that definition excludes recovery for losses resulting from an employee's intent to obtain a financial benefit for himself from commissions. The exclusion is not simply just for an employee's intent to financially benefit himself from earned commissions. Any sort of commission benefit is exempt from fidelity coverage, even unearned commissions.

The court finds that the Illinois appellate authority, as supported by the Minnesota and Maryland cases, is sufficiently persuasive so that it is likely that the Illinois Supreme Court would reach the same result. While the result of these cases is not necessarily the only one, it is certainly a reasonable result. The idea behind these cases is that certain forms of remuneration such as salaries and commissions are, generically speaking, earned in the normal course of employment. The final phrase of the clause, "or other employee benefits earned in the normal course of employment," implies that the previously listed benefits are generally earned in the normal course of employment. However, the fact that "commissions" are generally earned in the normal course of employment does not necessarily mean that all "commissions" are always earned in the normal course of employment. The word "commissions" could be read to include both earned and unearned receipts even though as a general matter commissions are an earned form of remuneration. This is precisely how *Mortell, Benchmark,* and *Berger* have chosen to read that word, particularly since, according to *Berger,* the absence of a comma between "other employee benefits" and "earned in the normal course of employment" means that the "earned" phrase should not relate back, over several commas, to strictly restrict the meaning of the word "commissions" to exclusively "earned commissions."

█ WNIC argues that if the above analysis is correct, then the last phrase "earned in the normal course of employment" is rendered meaningless. The court does not agree. The phrase could, and

evidently does, serve the salutory purpose of specifying generically the kinds of employee benefits that are similar to the kinds listed in the first eight nouns of part (b). The first eight nouns are "salaries," "commissions," "fees," "bonuses," "promotions," "awards," "profit sharing," "pensions." The ninth noun, the phrase, "other employee benefits earned in the normal course of employment" describes, in unspecified form, all the other forms of compensation that are generally earned in the normal course of employment. This general description is necessary because, of course, the list cannot go on forever. As Hartford explains, the last phrase achieves the useful aim of distinguishing the entire part (b) list from those compensation schemes that are generally unearned, such as payoffs, embezzlements, and other forms of theft. As an example, one common situation in which courts have found certain losses to be covered by this type of fidelity bond occurs when an employee makes improper "loans" to himself or third parties as part of a scheme to wrongfully acquire funds. *See, e.g., Liberty National Bank v. Aetna Life & Casualty Co.,* 568 F.Supp. 860, 867 (D.N.J.1983); *United Southern Bank of Sumner County v. Glens Falls Insurance Co.,* 548 F.Supp. 355 (M.D.Tenn.1982); *Bank of Huntingdon v. Smothers,* 626 S.W.2d 267 (Tenn.Ct. App.1981).[1] These improper "loans" are not even remotely analogous to salaries, commissions, or other forms of employee benefits normally earned in the course of employment. Therefore, they should not be and are not excluded from fidelity bond coverage. By contrast, as is evident from *Mortell, Berger,* and *Benchmark,* unearned salaries and commissions are nevertheless still salaries and commissions and therefore belong to the generic category of employee benefits that are normally earned in the course of employment. Accordingly, unearned commissions should be excluded from fidelity bond coverage. Therefore, this court holds that because the word "commissions" includes "unearned commissions," the losses due to Masteller's and Phillips' unearned commissions are excluded from indemnification.

WNIC raises another completely separate argument why its fidelity bond covers the losses incurred here, and although the argument is not well articulated, it appears sufficient to preclude summary judgment in Hartford's favor. This argument is viable even if, as this court has just held, Masteller's and Phillips' intent to retain unearned commissions for themselves is excluded from coverage. First, WNIC points out that the pertinent language of the rider also provides that fraudulent and dishonest acts may be committed with an intent "to obtain financial benefit for the Employee or the Agent, *or for any other person or organization* intended by the Employee or the Agent to receive such benefit, other than ... employee benefits earned in the normal course of employment." (emphasis added). Thus, if Masteller embezzled funds from WNIC, and turned them over to a third party (or kept the money for himself), Masteller's act would fall within the definition of dishonest intent (assuming he also intended to harm WNIC through the embezzlement). This is because embezzled funds, either for himself or a third party, are funds not received as "commissions," and are not otherwise earned in the normal course of employment. However, as the preceding discussion implies, if Masteller received commissions, whether earned or unearned, and then turned those commission funds over to a third person, indemnity would not be available because the benefit to the third person would not be "other than ... commissions ... or other employee benefits earned in the normal course of employment."

WNIC argues that in engineering their schemes, Masteller and Phillips intended third parties to receive benefits other than the benefits earned normally in the course of employment. Therefore, it concludes, part (b) of the dishonesty definition is satisfied. Several types of third-party benefits are argued. First, the Burlington Northern "donors" were intended to receive tax

1. These published cases, which help further clarify the meaning of bond definition and which are helpful to plaintiff, were not presented to the court by either party.

deductions from the use of their names as donors of the premium payments on behalf of the university personnel. Second, Phillips' co-conspirator Reeve was paid fees for his work in the Phillips scheme, and other organizations were also paid fees for their work in the Phillips scheme. Third, legitimate lending institutions gave loans (used to finance premium payments) and these institutions presumably received interest payments as a result. Fourth, at least one organization, Weatherhill Resources Ltd., received proceeds from the cash value of the policies that Phillips engineered. Although the evidence is not clear, it appears that some of these loan proceeds were used to enable Phillips to pay for further premiums and thus were not retained by Weatherhill Resources. Some loan proceeds, however, may have been retained without repayment of the loans and were therefore available to Weatherhill for its own use. Finally, the university personnel were intended to receive the financial benefit of insurance protection on their lives.

■ Under the terms of the fidelity bond, only a "loss resulting directly from one or more dishonest or fraudulent acts" will be indemnified. (See Rider at ¶ 1(A)(1)–(3).) Therefore, those losses which result directly from an intent to financially benefit third parties will be indemnified. Under the contract, it does not matter that the underlying motive for providing third-party benefits was to encourage extended participation in the fraudulent schemes so as to help Masteller and Phillips get more money for themselves; as long as a third party is intended to receive a benefit, those third-party benefits come within the terms of the definition of dishonesty if they resulted in a direct loss to WNIC. Thus, if Masteller and Phillips engaged in acts with an intent to financially benefit third parties (with other than normal employee benefits) and those acts resulted directly in losses to WNIC, then WNIC could seek indemnity under the bonds even though the overall motive for those third-party benefits was only to enable Masteller and Phillips to acquire more commissions for themselves.

■ Because of the way in which these third-party benefits are presented to the court, it is difficult to determine the precise nature of the benefits. However, some conclusions can be drawn. The tax deductions do not represent third-party benefits from which a resultant loss can be indemnified. Masteller's and Phillips' intention that the Burlington Northern employees receive tax deductions did not result in a *direct* loss to WNIC. If indeed those deductions were taken, then the United States Government suffered the only direct loss, as the deductions were fraudulent. If the deductions were never taken, then no one suffered a direct loss. To be sure, Masteller's and Phillips' schemes employed the enticement of a tax deduction to get the names of phony donors, and this entire scheme resulted in a loss to WNIC. But the contract only indemnifies losses directly resulting from an intent to benefit third parties or an employee. This means that the benefit to the third party must come from the loss to WNIC; were it otherwise, the loss would not be a "direct" result of the benefit to a third party. In short, the intent to benefit a third party with a tax deduction does not result in a "direct" loss to WNIC because tax deductions do not cause funds to be taken from WNIC. (Indeed, even the hypothetical scenario described in WNIC's Skillern article involves a third-party benefit where the benefit consists only of funds transferred from the fidelity-insured employer to the third party.)

■ The second and third types of third-party benefits—fees paid to those who participated in the scheme and interest receipt obtained by legitimate lending institutions for loans which were used to finance premium payments—may involve transfers of funds from WNIC to third parties. Thus, the loss to WNIC from these intentional benefits may be "direct." However, even assuming that these third-party benefits did originate with WNIC's own funds, these funds were given to the third parties only after Phillips had received these funds in the form of (unearned) commissions. For the same reason that Phillips' and Mas-

teller's unearned commissions could not be indemnified under the fidelity bonds, those same commissions when transferred to third parties for whatever purpose cannot be indemnified. Such unearned commissions received by third parties are excluded from indemnity coverage in the fraudulent act definition to the same extent as if they had only been received by Masteller and Phillips themselves.

■ The final two types of third-party benefits appear to have resulted in a direct transfer of funds from WNIC to third parties *and* appear not to be commissions (or other normal employee benefits) previously received by Masteller and Phillips. Specifically, the loan proceeds to Weatherhill Resources drawn against the cash value of the insurance policies, and the insurance policy benefits on the lives of university personnel, are financial benefits intended for third parties that resulted in a direct loss to WNIC (a transfer from WNIC to those third parties) and are benefits "other than ... commissions ... or other employee benefits earned in the normal course of employment." These losses therefore must be indemnified. The evidence presented to the court plausibly shows that Phillips intended Weatherhill Resources to take out a loan for the cash value of its insurance policy and *not* pay at least part of the loan back. To the extent that Phillips intended Weatherhill Resources to retain these proceeds (and not use them to pay for further insurance premiums), this is (1) a financial benefit to a third party other than a benefit normally earned in the course of employment, and (2) a "direct" loss to WNIC. Similarly, the evidence also plausibly shows that Phillips and Masteller intended certain university personnel to receive life insurance protection. To the extent that these personnel (or their beneficiaries) actually received life insurance benefits, this is a financial benefit to third parties other than one normally earned in the course of employment and a direct loss to WNIC.

Despite Hartford's arguments to the contrary, these benefits were not "second order" benefits outside of the dishonesty definition. Hartford maintains that if Mastel-

ler spent its commissions on, say, handball court times, this would be a third-party benefit but also a second order benefit not included within the rider's definition of dishonesty. This is true only because the handball court third-party benefits would not be the cause of WNIC's losses, as the definition requires. In fact, those handball court expenditures would only be the result of those losses rather than the cause. By contrast, the financial benefits that Weatherhill Resources and the university personnel were intended to receive were the cause of certain losses to WNIC. Therefore, those losses can be indemnified, assuming of course that part (a) of the dishonesty definition requiring that Masteller and Phillips intended WNIC to sustain those losses is satisfied.

The evidence presently before the court does not make clear the extent of the direct loss WNIC suffered from these third-party transactions—that is, the extent to which funds were transferred from WNIC to these third parties. Therefore, this issue cannot be resolved at this summary judgment stage. Furthermore, because Hartford has disputed, with supporting affidavits, whether Masteller and Phillips had the requisite intent to injure WNIC, summary judgment cannot be entered for WNIC on these two particular types of losses. Accordingly, the court denies both cross-motions for summary judgment.

Given the nature of this opinion, the issues in this case have been substantially narrowed and any renewed motion for summary judgment should take account of this. The only possible recovery for WNIC is for the "direct" losses from WNIC to Weatherhill Resources and university personnel (and any other third parties the court may have overlooked), where the direct loss consists of funds, other than normal employee benefits, transferred from WNIC to those third parties and retained by them for their use. This excludes funds which originated as "commissions" to Masteller and Phillips and were then transferred to the third parties. At this point, the only such direct losses appear to be the cash value loan proceeds to Weatherhill Resources and the life insurance proceeds to the universities.

One question that remains, therefore, is the extent of such direct losses. Of course, before WNIC can recover for these direct losses it must contend with any other defenses Hartford may interpose. One such defense that Hartford has intimated it might raise is whether Masteller and Phillips actually intended WNIC to sustain the losses it did, as is required by part (a) of the dishonesty definition. Such questions are not resolved in this opinion and are left for another day.

### Conclusion

Plaintiff's and defendant's motions for summary judgment are both denied. The issues left open in this case are substantially narrowed as specified within this opinion.