2016 IL App (2d) 150303
No. 2-15-0303
Opinion filed March 31, 2016

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| ROBERT R. McCORMICK FOUNDATION and CANTIGNY FOUNDATION, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 13-L-481 |
| ARTHUR J. GALLAGHER RISK MANAGEMENT SERVICES, INC., | ) ) ) | Honorable |
| Defendant-Appellee. | ) ) | Kenneth L. Popejoy, Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.
Justices Jorgensen and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, the Robert R. McCormick Foundation and the Cantigny Foundation (the Foundations) filed suit against their former insurance broker, Arthur J. Gallagher Risk Management Services, Inc. (Gallagher), for the loss of defense coverage under the Foundation's directors' and officers' (D&O) liability insurance policy. The trial court determined that an exclusion in the D&O policy would have prevented coverage altogether. Because the trial court erred in interpreting the exclusion by failing to see it as ambiguous, we reverse and remand.

¶ 2    Since the parties filed cross-motions for summary judgment, we take as true the facts alleged in the underlying complaints. The Foundations were formerly the second-largest

shareholders of the Tribune Company, a large publicly traded media corporation that, at one point, owned its namesake newspaper, *The Chicago Tribune*, as well as *The Los Angeles Times*, *Newsday*, *The Sun Sentinel*, *The Baltimore Sun*, WGN-TV, WGN-AM radio, and the Chicago Cubs. The Foundations sold the last of their Tribune stock when the company was sold in a leveraged buyout, or LBO, in 2007. In an LBO, an investor buys the stock of a corporation with the proceeds of a loan secured by the corporation's assets; the company is thus "leveraged" to buy out its shares. In this instance, however, the company wa*s highly* leveraged. Prior to the LBO, Tribune had a market capitalization of around $8 billion and was carrying $5 billion in debt. Though Tribune stock was trading around $27 a share, the LBO purchasers offered stockholders $34 a share in order to gain control of the company. Once the LBO closed in December 2007, the company was saddled with an additional $8.5 billion in debt. Then, the 2007-08 financial crisis resulted in, among other things, the single worst performing year in the newspaper industry's financial history. In December 2008, within a year of the LBO, Tribune entered bankruptcy.

¶ 3    The LBO and the bankruptcy left Tribune's unsecured creditors—that is, various holders of debt from bonds Tribune had issued over the years prior to the LBO—holding the proverbial bag. First, the LBO itself subordinated the unsecured creditors' debt to secure financing for the buyout. Meanwhile, the extended pendency of the Tribune bankruptcy proceeding left the unsecured creditors unable to collect. In December 2011, the bankruptcy court confirmed a plan that enabled the unsecured creditors to pursue or resume the pursuit of their claims outside of the bankruptcy proceedings. *In re Tribune Co.*, 464 B.R. 126 (Bankr. D. Del. 2011), *on reconsideration*, 464 B.R. 208 (Bankr. D. Del. 2011). Soon after, the various creditors had on file nearly 50 separate lawsuits challenging the LBO in state and federal courts around the

country. Although the LBO suits were filed by different groups of bondholders and were based on a number of different legal theories, they all had the same objective: to unwind the LBO and claw back the sale's proceeds from the company's former shareholders. Many of the suits named as defendants all former Tribune stockholders who had sold more than $25,000 worth of Tribune stock. As a result, the suits collectively were brought against thousands of defendants. The Foundations were named as defendants in three of these suits.

¶ 4    All of the LBO suits were transferred to and remain pending in the United States District Court for the Southern District of New York and some, including the three against the Foundations, were dismissed and are presently before the Second Circuit Court of Appeals. See generally *In re: Tribune Co. Fraudulent Conveyance Litigation*, 831 F. Supp. 2d 1371 (J.P.M.L. 2011); *In re Tribune Co. Fraudulent Conveyance Litigation*, Nos. 1:12-mc-02296, 13-3992 (2d Cir. Mar. 16, 2016). Of the three LBO suits against the Foundations, the first was brought by the former creditors' committee, whose claims were assigned to a litigation trustee (*Kirschner v. FitzSimons*, No. 1:12-cv-02652 (S.D.N.Y.)); the second by a successor indenture trustee (*Deutsche Bank Trust Co. Americas v. Ohlson Enterprises*, No. 1:12-cv-00064 (S.D.N.Y.)); and the third by 189 retired Tribune employees (*Niese v. ABN AMRO Clearing Chicago LLC*, No. 1:12-cv-00555 (S.D.N.Y)).

¶ 5    In 2008, several years before the LBO lawsuits were filed, the Foundations purchased through Gallagher a $15 million D&O policy issued by Chubb Insurance and a $10 million excess policy issued by a separate company. (For convenience we refer to it as a single $25 million Chubb D&O policy.) In 2010 Gallagher advised the Foundations that instead of renewing the Chubb policy they could obtain identical "apples-to-apples" D&O coverage at a reduced premium with a $25 million policy from Chartis Insurance. The Foundations followed their

broker's advice; they purchased the Chartis policy and let the Chubb policy lapse. Soon after, the three LBO suits were filed against the Foundations. The Foundations tendered the suits to Chartis, but Chartis refused them under a securities exclusion in its D&O policy. The Foundations began to pay their own defense costs (which counsel indicated at oral argument were substantial) and sued Gallagher for malpractice.

¶ 6    In the complaint in this case, the Foundations allege that they would have received both defense and indemnification coverage for the three LBO suits under the Chubb policy. The Foundations also allege that they would have maintained the Chubb policy but for Gallagher's erroneous advice that the coverage provided by the Chubb and Chartis polices was identical. Gallagher, which stands in the insurer's shoes for the purpose of this malpractice action (*Skaperdas v. Country Casualty Insurance Co. of Libertyville, Inc.*, 2013 IL App (4th) 120986, ¶ 23, *aff'd*, 2015 IL 117021; *Lake County Grading Co. v. Great Lakes Agency, Inc.*, 226 Ill. App. 3d 697, 701 (1992)), answered that a securities exclusion in section 5(k) of the Chubb policy would also have prevented coverage.

¶ 7    At the trial court's direction, the parties filed motions for summary judgment on the exclusion in section 5(k) of the Chubb policy. The Foundations' motion, however, was for partial summary judgment and was confined to the question of whether the exclusion would have negated the insurer's duty to pay the Foundations' defense costs. (Since the underlying LBO litigation is still pending, a determination concerning either indemnification or the total for defense costs would be premature. See *Central Illinois Light Co. v. Home Insurance Co.*, 213 Ill. 2d 141, 158 (2004); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 127 (1992).) In contrast, Gallagher's motion was for complete summary judgment because, according

to Gallagher, the exclusion in section 5(k) of the Chubb policy would have prevented coverage altogether.

¶ 8    In a memorandum order, the trial court determined that the exclusion applied. It denied the Foundations' motion for partial summary judgment and granted Gallagher's motion for complete summary judgment. The Foundations appeal.

¶ 9    In this appeal, we consider the limited question of whether the exclusion in section 5(k) of the Chubb policy would have precluded coverage of the Foundations' defense costs for the underlying LBO suits. The controlling principles are well settled. To determine whether the insurer would have had a duty to defend, we look first to the allegations in each of the underlying complaints and compare those allegations to the relevant provisions of the insurance policy. *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455-56 (2010); *Outboard Marine Corp.*, 154 Ill. 2d at 107-08. If the facts alleged in the underlying complaint fall within, or potentially within, the policy's zone of coverage, then the insurer is obligated to defend the insured for the entire action. *Outboard Marine Corp.*, 154 Ill. 2d at 108. The policy is interpreted in the light most favorable to the insured. *Id*. at 108-09. Thus, if the policy's provisions are ambiguous, *i.e.*, susceptible to more than one reasonable interpretation, we are obligated to choose the interpretation that favors coverage. *Central Illinois Light Co.*, 213 Ill. 2d at 153. This principle of liberal construction also applies to exclusions, which must be construed narrowly in favor of coverage. *Gillen v. State Farm Mutual Automobile Insurance Co.*, 215 Ill. 2d 381, 393 (2005). "If recovery is premised on several theories of liability, some of which are excluded from coverage, the insurer is still obligated to defend as long as one theory might possibly fall within the scope of the policy coverage." *Pekin Insurance Co. v. Richard Marker Associates, Inc.*, 289 Ill. App. 3d 819, 821 (1997) (citing *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 194

(1976)). We review *de novo* the trial court's grant of summary judgment, as well as its interpretation of the complaints and the policy. *Pekin Insurance Co.*, 237 Ill. 2d at 455.

¶ 10    The Chubb D&O policy in question provided coverage for any claim against the Foundations, unless under the exclusion in section 5(k) the claim was based on a "violation of any Securities Laws ***." In the policy's definitions section, "Securities Laws" is defined as follows (we have added numbers for clarity):

> "[(1)] the Securities Act of 1933, Securities Exchange Act of 1934, Investment Company Act of 1940, [(2)] any state 'blue sky' securities law, or [(3)] any other federal or state, or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or [(4)] any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the sale or purchase, of securities."

¶ 11    The federal and state laws alluded to in the definition's first three clauses protect investors against stock-price manipulation by regulating transactions upon securities exchanges and by imposing reporting requirements. None of the allegations in the complaints in the three LBO suits, however, accuse the Foundations of having violated any federal or state securities regulation akin to those listed in the first three clauses of the definition. Instead, the complaints allege that the Foundations breached their fiduciary duty as Tribune's "controlling shareholders" (a label the Foundations tell us they vigorously dispute) and were principals in an LBO that was a sham transaction in violation of various states' fraudulent-conveyance laws. With this in mind, the issue before us then is whether each of the LBO suits fits within the fourth and final clause in the definition of "Securities Laws":

"[(4)] any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the sale or purchase, of securities."

¶ 12    Each party submits a different interpretation of the last clause. Gallagher contends that the phrase "any other provision" means "any other provision" in all of the law. Thus, according to Gallagher, the exclusion bars coverage for any litigation—based on any "statutory or common law used to impose liability"—in any way arising "in connection with" a stock sale. Under this interpretation, since the LBO suits arose "in connection with" the sale or offer of Tribune's stock, they would have been excluded. Gallagher asserts that its interpretation of the final clause is the only reasonable one and that therefore the clause is not ambiguous.

¶ 13    The Foundations contend that the definition of "Securities Laws" is narrow, appealing to the principle of *ejusdem generis* ("of the same kind"): that a list of like items creates a context such that any catch-all term in the list has a generic resemblance to the other terms. Accordingly, the Foundations assert that the phrase "any other provision *** used to impose liability" means any other provision of the same sort as those enumerated—*i.e.*, "any other provision" *like* the federal and state securities regulations alluded to in the definition's first three clauses. The Foundations do not acknowledge that there is another reasonable interpretation of the definition's final clause, which would render it ambiguous, but they do assert that *if* there is any ambiguity in the definition it should be construed in their favor.

¶ 14    The clause is ambiguous. That is, it is susceptible to more than one reasonable interpretation, despite the fact that "each party insists that the language unambiguously supports its position." *Central Illinois Light Co.*, 213 Ill. 2d at 153-54. Therefore, the Foundations are right; the narrow interpretation of the clause is the one that controls. See *id*. at 153 ("if the words

used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the [insurer]").

¶ 15    We note also that the narrow construction of the final clause is also the most plausible one. *Id.*; see also *Pekin Insurance Co.*, 237 Ill. 2d at 456. The narrow construction leads, as the Foundations assert, to a reading of "Securities Laws" that is limited to what one would ordinarily think of as "securities laws," *i.e.*, state and federal *laws* that regulate securities. Moreover, we can think of no reason (and Gallagher suggests none) why Chubb, when drafting the D&O policy, would set forth a detailed list of securities laws only to render it irrelevant with a concluding phrase like "any other provision" that has *no* connection to the list that preceded it. It stands to reason that, if the policy drafters intended to exclude any lawsuit arising in connection with a stock sale (as Gallagher suggests), they would have omitted altogether the definition's first three clauses listing securities laws, leaving only the fourth clause. That is the language used in *the Chartis* exclusion, which excludes any claim "in any way relating to any purchase or sale of securities"—full stop.

¶ 16    Keeping in mind the narrow interpretation of the Chubb policy's definition of "Securities Laws," we can easily determine that the exclusion in section 5(k) would *not* have prevented the Foundations from receiving defense coverage in the three LBO suits. None of the suits is based on an alleged violation of either "Securities Laws" or "securities laws" (*e.g.*, insider trading or fraudulent registration or reporting (see *Wilgus v. CyberSource Corp.*, 393 Ill. App. 3d 1039, 1047 (2009))) and each contains allegations that would fall outside the exclusion. The *Kirschner* complaint alleges, among other things, that the Foundations breached their fiduciary duty as Tribune's controlling shareholders by forcing the company to pursue and ultimately accept a ruinous sale. The *Deutsche Bank* and *Niese* complaints allege that the LBO was a fraudulent

conveyance in violation of Illinois, New York, and Massachusetts law because either the transaction left the company insolvent or the stockholders' shares were not worth what the purchasers paid for them. Securities laws are not intended to " 'provide a broad *** remedy for all fraud' " (*Gavin v. AT&T Corp.*, 464 F.3d 634, 640 (7th Cir. 2006) (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982))), and there is no way to characterize the allegations in the foregoing complaints as violations of "Securities Laws." Accordingly, we determine that each of the three complaints would not have been excluded from defense coverage by virtue of section 5(k) of the Chubb policy.

¶ 17    We emphasize that our holding is limited to the issue of the language in section 5(k) and how to interpret it. We make no determination as to whether defense coverage was actually triggered, an inquiry that will require the trial court to determine whether the LBO suits arose during the coverage period and were tendered in a time and manner consistent with the policy. The trial court's order granting summary judgment to Gallagher on the basis of the exclusion in section 5(k) is reversed and the cause is remanded to the trial court with directions to enter summary judgment in favor of the Foundations on the exclusion and for further proceedings.

¶ 18    Reversed and remanded with directions.