# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *3BC Properties, LLC v. State Farm Fire & Casualty Co.*,
### 2020 IL App (2d) 190501

</div>

| | |
|---|---|
| Appellate Court Caption | 3BC PROPERTIES, LLC; 3BC PROPERTIES-MITCHELL, LLC; 3BC PROPERTIES-DANIEL, LLC; and 3BC PROPERTIES-TAYLOR, LLC, Plaintiffs-Appellants, v. STATE FARM FIRE AND CASUALTY COMPANY, Defendant-Appellee. |
| District & No. | Second District<br>No. 2-19-0501 |
| Filed | July 27, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 17-MR-1452; the Hon. Paul M. Fullerton, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Edward J. Manzke, of The Collins Law Firm, P.C., of Naperville, for appellants.<br><br>Kyle McConnell, of Meagher & Geer, P.L.L.P., of Chicago, for appellee. |

Panel                 JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.

Justices McLaren and Bridges concurred in the judgment and opinion.

**OPINION**

¶ 1       In this appeal, we consider whether an employer can recover for an employee's wage theft under the terms of the employer's business insurance policy. Plaintiffs (whom we can refer to collectively as 3BC Properties, LLC, or 3BC) own and operate four Dunkin' Donuts franchise locations in Du Page County. 3BC purchased a business owners' insurance policy for each restaurant through State Farm Fire and Casualty Company (State Farm). All of the policies had identical language, so for convenience's sake, we refer to them as a single policy.

¶ 2                                     I. BACKGROUND

¶ 3       In 2016 and 2017, 3BC employed one Brenda Vazquez to manage each of the four restaurants. As part of her duties, Vasquez was responsible for supervising the employees and reviewing their time records for payment. 3BC also employed four of Vasquez's relatives in various roles at 3BC's restaurants. In April 2017, 3BC's owners discovered that Vazquez had falsified time records for herself and her four relatives; doing so resulted in overpayments to Vazquez and her kin of more than $66,000. The owners reported the fraud to the authorities and tendered claims for their losses to State Farm under the business insurance policy.

¶ 4       The State Farm policy contained a rider and an exclusion, which insured 3BC against *some* losses resulting from employee dishonesty. In insurance parlance, this type of rider is known as a "fidelity bond" or a "salary-and-benefits exclusion." The provision at issue here reads as follows:

"Employee Dishonesty

     1. We will pay for direct physical loss to Business Personal Property and 'money' and 'securities' resulting from dishonest acts committed by any of your 'employees' acting alone or in collusion with other persons (except you or your partner) with the manifest intent to:

         a. Cause you to sustain loss; and

         b. Obtain financial benefit (*other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other 'employee' benefits earned in the normal course of employment*) for:

            (1) Any 'employee'; or

            (2) Any other person or organization intended by that 'employee' to receive that benefit." (Emphasis added.)

When 3BC tendered the loss and sought reimbursement for Vasquez's wrongdoing, State Farm denied coverage citing the italicized language. 3BC sued for a declaratory judgment to determine coverage.

¶ 5       In the trial court, 3BC asserted that the salary exclusion was meant to cover "*bona fide* salary disputes." As there was no dispute that Vazquez committed fraud by falsifying time records, 3BC asserted that "[t]he money was not earned in the normal course of employment"

and therefore that the loss was covered under the endorsement. State Farm's position was that the endorsement covers certain types of fraud such as embezzlement or theft but not wage fraud. Accordingly, because the unearned salary payments were still paid by 3BC as salary, coverage for the loss was barred by the exclusion.

¶ 6    The parties filed cross-motions for summary judgment, and the trial court issued a six-page memorandum decision finding in State Farm's favor. The trial court noted that the only Illinois state court decision on point, *Mortell v. Insurance Co. of North America*, 120 Ill. App. 3d 1016 (1983), held that coverage was barred under a similar exclusion where the employees—two salesmen who sold unregistered securities and pocketed the commissions—"did not gain anything except a commission from the unauthorized trading." See *id.* at 1025. Thus, their commissions were the type of employer-employee transactions that were excluded from coverage, even though they were fraudulently obtained. See *id.* The trial court also referred to a federal case interpreting a similar rider under Illinois law, which held that "[a]ny sort of commission benefit is exempt from fidelity coverage, even unearned commissions." *Hartford Accident & Indemnity Insurance Co. v. Washington National Insurance Co.*, 638 F. Supp. 78, 83 (N.D. Ill. 1986). In addition, the trial court noted that, though there were some outliers, most out-of-state decisions analyzing the exclusion had reached the same conclusion about the exclusion. While cases like *Hartford* persuaded the trial court, the holding in *Mortell* bound it. Accordingly, the court granted judgment for State Farm. 3BC appeals.

¶ 7                                         II. ANALYSIS

¶ 8    The question before us is whether unearned salary payments are nonetheless salary and excluded from coverage. We review *de novo* the trial court's grant of summary judgment. *Robert R. McCormick Foundation v. Arthur J. Gallagher Risk Management Services, Inc.*, 2016 IL App (2d) 150303, ¶ 9. We construe any ambiguity in an insurance contract in favor of coverage and must construe exclusions narrowly. *Id.* That said, we find there is no ambiguity in the provision at issue, so we need not resort to any of the tools of construction.

¶ 9    In this case, we have a single sentence with two independent clauses. If we set to the side the perplexing use of paragraph breaks, the first clause states that the insurer will cover any loss intentionally caused by an employee to obtain a financial benefit "*other than* salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other 'employee' benefits earned in the normal course of employment." (Emphasis added.) 3BC contends that *unearned* salary payments are *not* " 'employee' benefits obtained in the normal course of employment"—but that reading is at odds with the policy's plain language. The parenthetical containing the exclusion merely lists the types of employer-to-employee payments and benefits that are excluded from coverage. Contrary to 3BC's interpretation, the phrase "normal course of employment" does *not* modify the word "salaries." Rather, it modifies the phrase "other 'employee' benefits" and describes a characteristic of an additional, general type of payment that is excluded from coverage. As the court in *Hartford* noted, the phrase— " 'or other employee benefits earned in the normal course of employment' ":

> "serve[s] the salut[a]ry purpose of specifying generically the kinds of employee benefits that are similar to the kinds listed in the first eight nouns of part (b). The first eight nouns are 'salaries,' 'commissions,' 'fees,' 'bonuses,' 'promotions,' 'awards,' 'profit sharing,' 'pensions.' The ninth noun, the phrase, 'other employee benefits earned in the normal course of employment' describes, in unspecified form, all the

other forms of compensation that are generally earned in the normal course of employment. This general description is necessary because, of course, the list cannot go on forever." *Hartford*, 638 F. Supp. at 83-84.

In other words, the parenthetical is merely a list where the last item is a catch-all—the equivalent of writing "etc."

¶ 10 The language in this fidelity bond has been an industry-wide standard since the mid-1970s (see *id.* at 81), and there are numerous cases interpreting the same provision under similar circumstances. As the trial court noted, almost all of these decisions hold that unearned salaries and unearned commissions are nonetheless salaries and commissions. That is, they do not lose their essential character as employer-to-employee financial transactions merely because they were obtained through deceit. One federal court put a finer point on the issue:

"Looking at the plain language of the policy, the interpretation rejecting coverage makes sense. If 'in the normal course of employment' means 'not obtained through employee dishonesty,' the policy language excluding salaries would become mere surplusage. That is, the language excluding salaries presumes that there are acts of employee dishonesty that result in increased employee benefits that the insured and insurer agreed to exclude from coverage. Further, as one court noted, 'unearned salaries and commissions are nevertheless still salaries and commissions and therefore belong to the generic category of employee benefits that are normally earned in the course of employment.' " *Performance Autoplex II Ltd. v. Mid-Continent Casualty Co.*, 322 F.3d 847, 858 (5th Cir. 2003) (*per curiam*) (quoting *Hartford*, 638 F. Supp. at 84).

See also *Resolution Trust Corp. v. Fidelity & Deposit Co. of Maryland*, 205 F.3d 615, 649 (3d Cir. 2000); *Municipal Securities, Inc. v. Insurance Co. of North America*, 829 F.2d 7, 9 (6th Cir. 1987) (*per curiam*); *Auburn Ford Lincoln Mercury, Inc. v. Universal Underwriters Insurance Co.*, 967 F. Supp. 475, 479 (M.D. Ala. 1997), *aff'd*, 130 F.3d 444 (11th Cir. 1997) (table); *ABC Imaging of Washington, Inc. v. Travelers Indemnity Co. of America*, 820 A.2d 628, 634 (Md. Ct. Spec. App. 2003); *Benchmark Crafters, Inc. v. Northwestern National Insurance Co. of Milwaukee*, 363 N.W.2d 89, 91 (Minn. Ct. App. 1985); *First Philson Bank, N.A. v. Hartford Fire Insurance Co.*, 1999 PA Super 51, ¶ 24; *Verex Assurance, Inc. v. Gate City Mortgage Co.*, Civ. No. C-83-0506W, 1984 WL 2918, at *1-2 (D. Utah Dec. 4, 1984). Furthermore, in two cases, employees manipulated their timecards to obtain extra salary, and the court affirmed summary judgment for the insurer, finding that the employer's claim was barred by the salary exclusion. See *R&J Enterprizes v. General Casualty Co. of Wisconsin*, 627 F.3d 723, 726-27 (8th Cir. 2010); *Dickson v. State Farm Lloyds*, 944 S.W.2d 666, 668 (Tex. App. 1997). We find these cases are well reasoned and persuasive.

¶ 11 As the trial court noted, there are several cases holding that, because the fraudulently obtained funds were not "earned," the loss was covered. Like the trial court, however, we find these cases fail to engage with the plain language of the salary exclusion. Simply put, these contrary decisions are conclusory and unconvincing. See *Cincinnati Insurance Co. v. Tuscaloosa County Parking & Transit Authority*, 827 So. 2d 765 (Ala. 2002); *Klyn v. Travelers Indemnity Co.*, 709 N.Y.S.2d 780 (App. Div. 2000); *Amerisure Insurance Co. v. DeBruyn Produce Co.*, 825 N.W.2d 666 (Mich. Ct. App. 2012) (*per curiam*). For example, in *Cincinnati Insurance*, the court held that, because The American Heritage Dictionary defined " 'salary' as 'fixed compensation for services paid to a person on a regular basis,' " the stolen funds "received in the form of payroll checks were not part of *** the employee's 'salary' because

those funds *exceeded* the fixed compensation that was to be paid for the services *provided*." (Emphases added.) *Cincinnati Insurance*, 827 So. 2d at 768 (quoting American Heritage Dictionary (4th ed. 2000)). That approach glosses over a good deal of semantic analysis and nuance. That is, the *Cincinnati Insurance* court appears to treat "salary" as a present payment for work already performed, which is to say, exclusively in the past tense. Other dictionary definitions of salary are more generalized and not as susceptible to such a strained interpretation. See, *e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/salary (last visited July 16, 2020) [https://perma.cc/P6TN-WG64] (defining "salary" as "fixed compensation paid regularly for services"). But more importantly, it must be remembered that "[d]ictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings." *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012). Here, context leads us to the conclusion that "salary" payments are the type of typical employer-to-employee transactions that are excluded from coverage under the fidelity bond.

¶ 12    In addition, we reject 3BC's reliance on these three cases to establish that the salary exclusion is ambiguous. "Ambiguity is not established merely because courts reach inconsistent results. [Citation.] The contrary interpretation must be reasonable, and for the reasons discussed, we conclude that it is not." *R&J Enterprizes*, 627 F.3d at 728.

¶ 13    Finally, we note that at oral argument, 3BC emphasized its reliance on our decision in *Oxford Bank & Trust v. Hartford Accident & Indemnity Co.*, 298 Ill. App. 3d 199 (1998). We find 3BC's reliance on this case puzzling. In *Oxford Bank*, we upheld the trial court's judgment in favor of the insured bank that losses from an employee check-kiting scheme were covered. *Id.* at 214. In this case, Vazquez was not accused of writing or depositing checks for 3BC. Courts have held that the exclusion at issue does not apply to similar forms of *direct* theft. That is, theft by employees through forging checks or fraudulently using employer credit cards (*Glaser v. Hartford Casualty Insurance Co.*, 364 F. Supp. 2d 529, 531-32 (D. Md. 2005)), embezzlement (*Universal Underwriters Insurance Co. v. Buddy Jones Ford, Lincoln-Mercury, Inc.*, 97-CA-00298-SCT (¶¶ 2-5) (Miss. 1999)), and stealing from the inventory (*Performance Autoplex II*, 322 F.3d at 850-51) are *not* excluded from coverage. In other words, had Ms. Vazquez used the contents of the stockroom as collateral for a loan, or helped herself to all the donuts in the restaurant, or sold one of the cappuccino machines on eBay, then 3BC's loss would be covered. But given the fact that there is an exclusion, the policy clearly was *not* designed to cover *all* conceivable employee criminal conduct, and wage theft is simply one form of indirect employee theft that is excluded from coverage.

¶ 14    Nothing in the decisions cited by 3BC persuades us that we should not continue to follow *Mortell* under principles of *stare decisis*. Moreover, our adherence to that prior construction serves an important reliance interest for both insurers and their customers. See *Continental Casualty Co. v. Pittsburgh Corning Corp.*, 917 F.2d 297, 299 (7th Cir. 1990).

¶ 15                                III. CONCLUSION

¶ 16    In conclusion, we agree with the overwhelming majority of courts that have addressed this issue. Wage theft simply is not covered under this insurance policy. Therefore, we affirm the judgment of the circuit court of Du Page County.

¶ 17        Affirmed.